## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHELLE STREICHER, derivatively on behalf of NEWELL BRANDS INC., | |
| Plaintiff, | **C.A. No. _____** |
| vs. | |
| MICHAEL B. POLK, RALPH J. NICOLETTI, JAMES L. CUNNINGHAM, III, IAN G.H. ASHKEN, THOMAS E. CLARKE, KEVIN CONROY, SCOTT S. COWEN, MICHAEL T. COWHIG, DOMENICO DE SOLE, MARTIN E. FRANKLIN, ROS L'ESPERANCE, STEVEN J. STROBEL, MICHAEL A. TODMAN, and RAYMOND G. VIAULT, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| NEWELL BRANDS INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Michelle Streicher ("Plaintiff"), by her undersigned attorneys, derivatively and on

behalf of Nominal Newell Brands Inc. ("Newell" or the "Company") Michael B. Polk, Ralph J.

Nicoletti, James L. Cunningham, III, Ian G.H. Ashken, Thomas E. Clarke, Kevin Conroy, Scott S.

Cowen, Michael T. Cowhig, Domenico De Sole, Martin E. Franklin, Ros L'Esperance, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault (collectively, the "Individual Defendants," and together with Newell, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Newell, unjust enrichment, waste of corporate assets, violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for her complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Newell, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Newell's directors and officers from February 6, 2017 through the present (the "Relevant Period").

2.      Newell is a manufacturer and distributor of a number of name-brand consumer and commercial products sold worldwide.

3.      Prior to April 2016, Newell was named Newell Rubbermaid. Newell Rubbermaid acquired Jarden Corporation ("Jarden") in April 2016 (the "Merger"), and thereafter changed its name to Newell Brands Inc.

4.     Despite the surface similarities between Newell's legacy businesses and those acquired in the Merger, Newell and Jarden had been operated in vastly different ways prior to the Merger. Newell's model was highly centralized, whereas Jarden had operated under a decentralized, entrepreneurial business model. These undisclosed differences in operating structure and culture resulted in internal strife at the post-Merger entity, and caused material adverse effects on Newell's financial and operating performance during the Relevant Period.

5.     Following the Merger, Newell reorganized its businesses. Beginning in January 2017, the Company operates in five reportable, dubbed "Live," "Learn," "Work," "Play," and "Other."

6.     Newell's sales are generated predominately through large retailers—roughly 72% of the Company's revenues in 2016 came from sales to U.S. customers, and half of those U.S. revenues were generated by a group of 20 retailers.

7.     In describing the Company's financial results to the investment community and in its internal tracking, the Individual Defendants caused Newell to use the non-GAAP[1] measure of "core sales." As stated in multiple earnings press releases issued during the Relevant Period:

> The company's management believes that core sales provides a more complete understanding of underlying sales trends by providing sales on a consistent basis as it excludes the impacts of acquisitions (other than the Jarden acquisition), planned or completed divestitures, the deconsolidation of the company's Venezuelan operations, retail store openings and closings, and changes in foreign currency from year-over-year comparisons.

8.     Newell records sales based on a "sell-in" method, under which sales are recognized upon shipment or delivery of product to is customers. This product then becomes "channel inventory" as it has been purchased by the retailer or distributor, but not yet been sold to the end

---

[1] "GAAP" stands for U.S. Generally Accepted Accounting Principles.

consumer (termed "sell-through" or "sell-out"). Where sell-in exceeds sell-through, channel inventory levels typically increase.

9.      In the United States, the retail environment has been experiencing disruptions since before the beginning of the Relevant Period, as consumers migrate from shopping at "brick-and-mortar" retail establishments to purchasing goods online through an e-commerce model. Newell has represented that in connection with this sea change, retailers have been reducing store counts and inventory levels, among other coping strategies.

10.     As a global firm, Newell has a global manufacturing footprint and long supply chain. As a result, the Company is unable to respond quickly to changes in demand by, *inter alia*, cancelling ordered merchandise in a timely fashion. This lack of flexibility exacerbates the accumulation of unsold inventory.

11.     During the Relevant Period, the Individual Defendants caused the Company to assert that, despite a challenging retail environment, the Company's financial results in the early part of the Relevant Period evidenced the success of its strategy of implementing its legacy business model to drive growth in the businesses acquired from Jarden. The Individual Defendants further caused the Company to assert that the financial effects of retail inventory reductions on Newell were "behind" the Company.

12.     However, the Individual Defendants caused the Company to fail to disclose that such performance was attributable to Newell's granting of heavy discounts to the Company's customers, and such discounts had resulted in high levels of channel inventory going into 2017's back-to-school and holiday shopping seasons. As a result, the Individual Defendant were aware that future sales would be lower as a result of retailers' need to purchase fewer products in the future in order to clear the large amounts of Newell inventory in their possession.

13.     The Individual Defendants were aware of these high inventory levels, but failed to disclose them. As stated during a conference call with analysts and investors held on November 2, 2017, Defendant Michael B. Polk revealed that the Company actively monitors inventory in the retail channel.

14.     On November 2, 2017, the Individual Defendants caused the Company to report its financial results for the quarter ended September 30, 2017 in a press release and during an earnings call held with analysts and investors. The Company revealed core sales growth of 0.4%, below Wall Street estimates of 2.9%. This reduction was attributed to "retailers pull[ing] back on order rates and rebalanced inventories" in order to reduce the previously undisclosed buildup of inventory in the retail channel. The Company further revealed that order rates were reduced despite retailers experiencing sell-out growth of 3.5%, evidencing the large amounts of inventory that had built up in the retail channel.

15.     On this news, the Company's share price dropped nearly 27%, or $10.99, from a closing price of $41.00 per share on November 1, 2017 to close at $30.01 per share on November 2, 2017.

16.     The Individual Defendants caused the Company to issue a press release before markets opened on January 25, 2018 announcing Newell's preliminary estimated financial results for the year and quarter ended December 31, 2017. The press release revealed that Newell's estimated core sales growth for fiscal year 2017 would be 0.8%, below previously issued guidance of 1.5% to 2.0%. Based on reported core sales growth in prior quarters of 2017, these newly issued core sales growth figures implied negative organic sales growth of 2.0% in the quarter ended December 31, 2017.

17.     The January 25, 2018 press release asserted that "the company's core sales results were impacted by an acceleration of the gap between sell-in and sell-through results due to a continuation of retailer inventory rebalancing in the U.S. and the bankruptcy of a leading baby retailer."[2] However, Newell's disappointing financial performance was not attributable to retailer bankruptcies or macroeconomic conditions, but were instead the result of factors specific to Newell's operations. Such Company-specific factors included the high levels of channel inventory and management's failures to achieve synergies from the Merger flowing from cultural and operational differences between legacy Newell and Jarden businesses. The fact that Newell's performance is attributable to issues within the Company rather than market conditions is evidenced by the fact that, since May 2017, the Company has reduced its estimated 2018 EBITDA[3] by 22%, while firms in its peer group have only reduced their estimated 2018 EBITDA by 3%.

18.     The Individual Defendants further caused the January 25, 2018 press release to reveal that Newell was exploring "strategic options" to restructure the Company though divesting commercial and industrial assets. The press release reported that such divestitures were expected to result in a 50% reduction in Newell's customer base, and a 50% reduction in the Company's warehouse and global factory footprint.

19.     Also on January 25, 2018, the Company issued a press release announcing the resignations of three board members, Defendants Ian G.H. Ashken, Domenico De Sole and Martin E. Franklin.

20.     On this news, the Company's share price dropped nearly 21%, or $6.42, from a closing price of $31.23 per share on January 24, 2018 to close at $24.81 per share on January 25,

---

[2] Upon information and belief, the "leading baby retailer" referred to in the January 25, 2018 press release was Toys "R" Us.
[3] Earnings before interest, tax, depreciation, and amortization.

2017. Analysts also downgraded their ratings of Company stock, pointing to Newell's lack of sales growth resulting from excess channel inventory and concerns over synergies resulting from the Merger.

21.     As reported by *The Wall Street Journal* on February 9, 2018, three former executives of Jarden joined forces with Starboard Value and Opportunity Master Fund Ltd ("Starboard") to mount a proxy battle to force out Newell's existing management. Newell issued a press release the same day confirming that Starboard intended to nominate 10 candidates for election to Newell's Board at its 2018 Annual Meeting of Shareholders.

22.     The Company issued a press release on April 23, 2018 announcing that Starboard and Newell had entered into an agreement resolving the proxy contest, under which the Company agreed to significant changes to the Board, both immediately and through nominating mutually agreed upon directors for election at the 2018 Annual Meeting of Shareholders.

23.     In breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

24.     Also during the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and/or misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to the investing public that failed to disclose that: (1) the Company's retail customers were holding high levels of unsold inventory of Newell products; (2) as a result of these excess inventories, Newell was subject to an increased risk that sales growth would be lower in future reporting periods; (3) the resulting adverse effects on sales were specific to Newell, rather than the

result of a macroeconomic trends, as represented by the Individual Defendants; (4) the Company's sales figures in the early part of the Relevant Period were due, in part, to significant discounts provided to Newell's customers that exacerbated high levels of unsold inventory; (5) operational and cultural differences between Newell and Jarden were causing internal strife and limiting synergies from the Jarden acquisition; (6) risks associated with the Company's long supply chain prevented Newell from responding quickly to market signals; (7) Newell's business fundamentals were not improving, contrary to representations made during the Relevant Period by certain of the Individual Defendants; (8) the Company failed to maintain internal controls; and (9) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

25.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact to the investing public.

26.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while six of them engaged in insider sales, netting proceeds of approximately $19.8 million. Approximately 5.6 million shares of the Company's common stock were repurchased between February 1, 2017 and January 31, 2018 for approximately $179.1 million.[4] As the Company's stock was actually only worth $24.81 per share, the price at which it was trading when markets closed on January 25, 2018, the Company overpaid approximately $41 million in total.

---

[4] Upon information and belief, some, if not all, of the shares repurchased in February 2017 and January 2018 were repurchased subsequent to the beginning of the Relevant Period on February 6, 2017 and prior to the truth emerging on January 25, 2018, respectively.

27.     In light of the Individual Defendants' misconduct, which has subjected Newell, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Senior Vice President and Chief Accounting Officer ("CAO") to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

28.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's and CAO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Newell Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-

5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

30.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

31.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32.     Venue is proper in this District because the Company is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

33.     Plaintiff is a current shareholder of Newell common stock. Plaintiff has continuously held Newell common stock at all relevant times.

### Nominal Defendant Newell

34.     Newell is a Delaware corporation with its principal executive offices at 221 River Street, Hoboken, NJ 07030. Newell's shares trade on the NYSE under the ticker symbol "NWL."

### Defendant Polk

35.     Defendant Michael B. Polk ("Polk") has served as the Company's CEO since 2011 (serving as President and CEO from 2011 to 2016) and a member of the Board since 2009. He has also served as the Company's President since May 25, 2018. According to the Company's Schedule 14A filed with the SEC on March 30, 2017 (the "2017 Proxy Statement"), as of March 20, 2017, Defendant Polk beneficially owned 1,229,318 shares of the Company's common stock.[5]

---

5 Includes 225,872 shares issuable pursuant to stock options and RSUs currently exercisable or exercisable or vesting within 60 days of March 20, 2017, 423,031 shares held in grantor retained

Given that the price per share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, Polk owned approximately $59.7 million worth of Newell stock.

36.     For the fiscal year ended December 31, 2016, Defendant Polk received $21,684,542 in compensation from the Company. This included $1,312,500 in salary, $16,552,730 in stock awards, $2,827,125 in non-equity incentive plan compensation, and $992,187 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Polk received $15,257,808 in compensation from the Company. This included $1,350,000 in salary, $12,950,544 in stock awards, and $957,264 in all other compensation.

37.     The Company's revised Schedule 14A filed with the SEC on April 25, 2018 (the "2018 Proxy Statement") stated the following about Defendant Polk:

> **Michael B. Polk**,[6] age 57, has been Chief Executive Officer of the Company since 2016 and was previously President and Chief Executive officer since 2011. Prior to joining the Company, he had been President, Global Foods, Home & Personal Care, Unilever, a consumer goods company, since 2010. Mr. Polk joined Unilever in 2003 as Chief Operating Officer, Unilever Foods USA and subsequently became President, Unilever USA in 2005. From 2007 to 2010, Mr. Polk served as President, Unilever Americas. Prior to joining Unilever, Mr. Polk spent sixteen years at Kraft Foods Inc., a consumer foods company, and three years at The Procter & Gamble Company. At Kraft Foods, Mr. Polk was President, Kraft Foods Asia Pacific, President, Biscuits and Snacks Sector, and was a member of the Kraft Foods Management Committee. Mr. Polk brings outstanding global marketing, consumer innovation, customer development and operations leadership to the Board. He has been successful in leading multi-billion dollar brands, in managing diverse product categories and navigating complex geographies. Mr. Polk serves on the Board of Directors of Colgate-Palmolive Company and is a former member of the Board of Directors of The Yankee Candle Company, Inc.

**Defendant Nicoletti**

38.     Defendant Ralph Nicoletti ("Nicoletti") has served as the Company's Executive Vice President and CFO since 2016. He has announced his intention to retire from Newell at the

---

annuity trusts, and 47,303 shares held in trust for the benefit of Defendant Polk's children.
[6] Emphasis in original unless otherwise noted throughout.

end of 2018. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant Nicoletti beneficially owned 218 shares of the Company's common stock.[7] Given that the price per share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, Nicoletti owned approximately $10,581 worth of Newell stock.

39.     For the fiscal year ended December 31, 2016, Defendant Nicoletti received $10,918,010 in compensation from the Company. This included $493,845 in salary, $1,900,000 in bonus, $7,762,629 in stock awards, $709,161 in non-equity incentive plan compensation, and $52,375 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Nicoletti received $4,422,621 in compensation from the Company. This included $875,000 in salary, $3,372,288 in stock awards, and $175,333 in all other compensation.

40.     The Company's website states the following about Defendant Nicoletti:[8]

Ralph Nicoletti is the Executive Vice President and Chief Financial Officer of Newell Brands. He has more than 35 years of finance experience, and is a seasoned executive having held CFO roles at three global companies. His career includes 27 years of diverse experience at Kraft Foods Inc. and as EVP-CFO of Tiffany, Cigna and Alberto Culver.

Prior to joining Newell Brands, as EVP-CFO, Ralph led a variety of initiatives across the consumer products, healthcare and insurance, and luxury retail industries, including improvement of business operating performance, M&A strategy and integration, capital structure optimization, IT transformation and organization development.

Ralph serves on the Board of Directors of Arthur J. Gallagher & Co., one of the world's largest insurance brokerage and risk management services firms.

He grew up in Rockland County, New York, and graduated from Pace University in 1979 with a bachelor's degree. He went on to earn his MBA with honors in 1982.

**Defendant Cunningham**

---

[7] Includes 25 shares held in revocable trust and 193 shares in an individual retirement account ("IRA").

[8] https://www.newellbrands.com/ralph-nicoletti. Last visited October 2, 2011.

41.     Defendant James L. Cunningham III ("Cunningham") served as the Company's Senior Vice President and CAO since May 2016, and prior to the Merger served as the CAO of Jarden since 2012. On October 4, 2018, the Company filed a Form 8-K with the SEC announcing Defendant Cunningham's intention to depart from the Company in 2019, with a projected departure date of the later of March 1, 2019 or the date the Company files its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2018.

42.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Cunningham made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| June 2, 2017 | 1,609 | $   53.38 | $       85,888 |

Thus, in total, before the fraud was exposed, he sold 1,609 Company shares on inside information, for which he received approximately $85,888. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

**Defendant Ashken**

43.     Defendant Ian G.H. Ashken ("Ashken") served on the Company's Board of Directors from 2016 to January 21, 2018. Prior to the Merger, Defendant Ashken served as the Vice Chairman and President of Jarden from 2014 to 2016. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant Ashken beneficially owned 511,374 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, Ashken owned over $24.8 million worth of Newell stock.

44.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Ashken made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 13, 2017 | 30,000 | $ 48.47 | $ 1,454,100 |
| March 14, 2017 | 21,000 | $ 47.99 | $ 1,007,790 |

Thus, in total, before the fraud was exposed, he sold 51,000 Company shares on inside information, for which he received approximately $2.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

45.     The Company's 2017 Proxy Statement stated the following about Defendant Ashken:

> ***Ian G.H. Ashken***, age 56, was the Co-Founder of Jarden Corporation and served as its Vice Chairman and President from 2014 to 2016 when Jarden Corporation was acquired by the Company. Mr. Ashken became Vice Chairman, Chief Financial Officer and Secretary of Jarden in 2001 and served as Secretary of Jarden until 2007 and Chief Financial Officer until 2014. Mr. Ashken served as the Vice Chairman and/or Chief Financial Officer of three public companies, Benson Eyecare Corporation, Lumen Technologies, Inc. and Bollé Inc. between 1992 and 2000. Mr. Ashken also serves as a director of Platform Specialty Products Corporation and Nomad Foods Ltd. During the last five years, Mr. Ashken previously served as a director of Jarden Corporation, GLG Partners, Inc. and Phoenix Group Holdings.

### Defendant Clarke

46.     Defendant Thomas E. Clarke ("Clarke") served as a Company director from 2003 to March 18, 2018. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant Clarke beneficially owned 66,716 shares of the Company's common stock.[9] Given that the price

---

[9] Includes 5,353 shares issuable pursuant to stock options and RSUs currently exercisable or exercisable or vesting within 60 days of March 20, 2017, 64 shares owned through a family foundation, and 366 shares held in an irrevocable trust.

per share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, Clarke owned over $3.2 million worth of Newell stock.

47.     For the fiscal year ended December 31, 2017, Defendant Clarke received $280,530 in compensation from the Company, comprised of $135,000 in fees earned or paid in cash, $144,961 in stock awards, and $569 in all other compensation.

48.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Clarke made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| May 9, 2017 | 5,353 | $    52.49 | $      280,979 |

Thus, in total, before the fraud was exposed, he sold 5,353 Company shares on inside information, for which he received approximately $280,979. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

49.     The Company's 2017 Proxy Statement stated the following about Defendant Clarke:

> **Thomas E. Clarke**, age 65, has been President, Nike Innovation of Nike, Inc. since 2013. Dr. Clarke joined Nike, Inc. in 1980. He was appointed divisional Vice President in charge of marketing in 1987, corporate Vice President in 1989, General Manager in 1990, and he served as President and Chief Operating Officer from 1994 to 2000 and as President of New Business Ventures from 2001 to 2013. Dr. Clarke previously held various positions with Nike, Inc., primarily in research, design, development and marketing. Dr. Clarke also has previously served on the Board of Directors of Starwood, Inc. Dr. Clarke has expertise in global brand management, marketing and product development as well as substantial experience in organizational development and knowledge of supply chain operations. Dr. Clarke also played an integral role in the globalization of Nike. He also has substantial institutional knowledge regarding the Company, including its operations and industries, due to his longstanding service to the Board.

**Defendant Conroy**

50.     Defendant Kevin C. Conroy ("Conroy") served as a Company director from 2011 to March 4, 2018. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant Conroy beneficially owned 23,531 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, Conroy owned over $1.1 million worth of Newell stock.

51.     For the fiscal year ended December 31, 2017, Defendant Conroy received $260,530 in compensation from the Company, comprised of $115,000 in fees earned or paid in cash, $144,961 in stock awards, and $569 in all other compensation.

52.     The Company's 2017 Proxy Statement stated the following about Defendant Conroy:

> **Kevin C. Conroy**, age 56, joined Metro-Goldwyn-Mayer ("MGM") in 2016 in the newly created position of President, Digital and New Platforms. Prior to joining MGM, he was Chief Strategy and Data Officer, and President, Digital and Enterprise Development, Univision Communications, Inc. from 2009 to 2016. From 2001 to 2009, he served in a variety of senior programming, product and marketing roles at AOL LLC, most recently as AOL's Executive Vice President of Global Products and Marketing. From 1995 to 2001, Mr. Conroy served in a number of roles with Bertelsmann AG, including as Chief Marketing Officer & President, New Technology, BMG Entertainment. Mr. Conroy has significant global experience in advertising and media with particular expertise in the Internet and online and mobile media businesses. Mr. Conroy is also a director of Sotheby's. He has led large global efforts to build consumer websites and software applications and has managed a number of popular Internet brands, and has been at the center of the evolution of digital media from the introduction of the enhanced CD to HDTV to the mass adoption of the web and mobile platforms.

### Defendant Cowen

53.     Defendant Scott S. Cowen ("Cowen") served as a Company director from 1999 to March 18, 2018. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant Cowen beneficially owned 84,108 shares of the Company's common stock.[10] Given that the price per

---

[10] Includes 1,220 shares owned by Defendant Cowen's wife.

share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, Cowen owned approximately $4.1 million worth of Newell stock.

54.     For the fiscal year ended December 31, 2017, Defendant Cowen received $275,530 in compensation from the Company, comprised of $130,000 in fees earned or paid in cash, $144,961 in stock awards, and $569 in all other compensation.

55.     The Company's 2017 Proxy Statement stated the following about Defendant Cowen:

> **_Scott S. Cowen_**, age 70, has been President Emeritus and Distinguished University Chair of Tulane University since 2014. Prior thereto, he was President of Tulane University and Seymour S Goodman Memorial Professor of Business in Tulane's A.B. Freeman School of Business as well as Professor of Economics in the School of Liberal Arts since 1998. From 1984 to 1998, Dr. Cowen served as Dean and Albert J. Weatherhead III Professor of Management, Weatherhead School of Management, Case Western Reserve University. Prior to his departure in 1998, Dr. Cowen had been associated with Case Western Reserve University in various capacities since 1976. Dr. Cowen is also a director of Barnes & Noble Inc., Forest City Enterprises, Inc. as well as a Senior Advisor to the Boston Consulting Group. Dr. Cowen is a former member of the Board of Directors of Jo-Ann Stores, Inc. and NACCO Industries Inc. Dr. Cowen continues to serve as a director of American Greetings Corp., which as of 2013 is no longer publicly held. Dr. Cowen has been a director since the Company completed its merger with Rubbermaid. He has extensive academic and professional expertise in the areas of strategic financial management systems, corporate governance and leadership, including as a consultant with public companies in these areas and significant experience in crisis management (including in connection with recovery from Hurricane Katrina). Dr. Cowen has significant experience with consumer products companies as a director and also has substantial institutional knowledge regarding the Company, including its operations and industries, due to his longstanding service to the Board.

### Defendant Cowhig

56.     Defendant Michael T. Cowhig ("Cowhig") served as a Company director from 2005 to March 18, 2018, and served as Chairman of the Board from 2010 until his departure. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant Cowhig beneficially owned 62,017 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on March 20, 2017 was $48.54, Cowhig owned

over $3 million worth of Newell stock.

57.     For the fiscal year ended December 31, 2017, Defendant Cowhig received

$445,530 in compensation from the Company, comprised of $300,000 in fees earned or paid in

cash, $144,961 in stock awards, and $569 in all other compensation.

58.     The Company's 2017 Proxy Statement stated the following about Defendant

Cowhig:

> **_Michael T. Cowhig_**, age 70, has been non-executive Chairman of the Board since
> 2010. He retired in 2006 as President, Global Technical and Manufacturing of The
> Procter & Gamble Company—Gillette Global Business Unit ("P&G"), a post he
> held beginning in 2005. Prior to his position with P&G, he held the position of
> President, Global Technical and Manufacturing of The Gillette Company from
> 2004 to 2005. Mr. Cowhig joined Gillette in 1968, and thereafter served in a variety
> of roles, including Senior Vice President, Global Manufacturing and Technical
> Operations—Stationery Products from 1996 to 1997, Senior Vice President,
> Manufacturing and Technical Operations—Grooming from 1997 to 2000, Senior
> Vice President, Global Supply Chain and Business Development from 2000 to
> 2002, and Senior Vice President, Global Manufacturing and Technical Operations
> from 2002 to 2004. Mr. Cowhig has considerable operational expertise and global
> leadership experience, and he has demonstrated success in meeting the demands of
> product innovation by leveraging manufacturing technology with an intense focus
> on delivering cost reductions. He also has a strong track record for operational
> success, proven leadership abilities and knowledge of supply chain operations.
> Mr. Cowhig has substantial institutional knowledge regarding the Company,
> including its operations and industries, due to his longstanding service to the Board.
> Mr. Cowhig is a former member of the Board of Directors of CCL Industries.

### Defendant De Sole

59.     Defendant Domenico De Sole ("De Sole") served as a Company director from 2007

to January 21, 2018. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant De

Sole beneficially owned 63,469 shares of the Company's common stock.[11] Given that the price

---

[11] Includes 10,000 shares issuable pursuant to stock options and RSUs currently exercisable or
exercisable or vesting within 60 days of March 20, 2017.

per share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, De Sole owned approximately $3.1 million worth of Newell stock.

60.    For the fiscal year ended December 31, 2017, Defendant De Sole received $260,530 in compensation from the Company, comprised of $115,000 in fees earned or paid in cash, $144,961 in stock awards, and $569 in all other compensation.

61.    The Company's 2017 Proxy Statement stated the following about Defendant De Sole:

> ***Domenico De Sole***, age 73, has been the Chairman of Tom Ford International since 2005. Prior thereto he was President and Chief Executive Officer of Gucci Group NV, and Chairman of the Group's Management Board, a post he held from 1995 to 2004. From 1984 to 1994, Mr. De Sole served as Chief Executive Officer of Gucci America. Prior thereto, Mr. De Sole was a partner with the law firm of Patton Boggs & Blow from 1970 to 1984. Mr. De Sole also serves on the Board of Directors of GAP, Inc., Ermenegildo Zegna, Sotheby's and is a Member of the Advisory Board of Harvard Law School. Mr. De Sole is a former member of the Boards of Directors of Bausch & Lomb Incorporated, Delta Air Lines, Inc., Labelux SA, The Procter & Gamble Company and Telecom Italia S.p.A. Mr. De Sole has extensive global business experience as well as significant expertise in building and developing luxury brands and strengthening global marketing and operations, all of which are relevant to the Company as it invests in growing its premium brands worldwide.

## Defendant Franklin

62.    Defendant Martin E. Franklin ("Franklin") served as a Company director from 2016 to January 21, 2018. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant Franklin beneficially owned 2,047,227 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, Franklin owned approximately $99.4 million worth of Newell stock.

63.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Franklin made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 13, 2017 | 200,000 | $   48.48 | $   9,696,000 |
| March 14, 2017 | 140,000 | $   48.13 | $   6,738,200 |

Thus, in total, before the fraud was exposed, he sold 340,000 Company shares on inside information, for which he received approximately $16.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

64.     The Company's 2017 Proxy Statement stated the following about Defendant Franklin:

> **Martin E. Franklin**, age 52, was the Founder of Jarden Corporation and served as its Executive Chairman from 2011 until 2016 when Jarden Corporation was acquired by the Company. Mr. Franklin became Chairman and Chief Executive Officer of Jarden in 2001, and served as Chairman and Chief Executive Officer until 2011, at which time he began service as Executive Chairman. Mr. Franklin served as the Chairman and/or Chief Executive Officer of three public companies, Benson Eyecare Corporation, Lumen Technologies, Inc. and Bollé Inc. between 1992 and 2000. Mr. Franklin currently serves as a director of Restaurant Brands International Inc. (successor to Burger King Worldwide, Inc.), Chairman of Platform Specialty Products Corporation and Co-Chairman of Nomad Foods Limited. During the last five years, Mr. Franklin also previously served as a director of the following public companies: Jarden Corporation, Liberty Acquisition Holdings (International) Company, Kenneth Cole Productions, Inc., Justice Holdings Limited and Promotora de Informaciones, S.A. (successor to Liberty Acquisition Holdings Corp.).

**Defendant L'Esperance**

65.     Defendant Ros L'Esperance ("L'Esperance") served as a Company director from 2016 to February 27, 2018. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant L'Esperance beneficially owned 7,725 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, L'Esperance owned approximately $374,971 worth of Newell stock.

66.     For the fiscal year ended December 31, 2017, Defendant L'Esperance received $260,530 in compensation from the Company, comprised of $115,000 in fees earned or paid in cash, $144,961 in stock awards, and $569 in all other compensation.

67.     The Company's 2017 Proxy Statement stated the following about Defendant L'Esperance:

> **Ros L'Esperance**, age 55, has been Group Managing Director, Head of Americas Investment Banking and Chairman of Global Investment Banking for UBS AG since 2014. From 2013 to 2014, Ms. L'Esperance was Chairman of the Global Investment Banking Division at Barclays Capital Inc. and served as a member of several Operating and Executive Committees within Barclays. Prior to being named Chairman, Ms. L'Esperance was jointly responsible for Corporate Finance and M&A at Barclays from 2008 to 2013. She joined Barclays in 2008 from Lehman Brothers where she was co-head of Global Corporate Finance. During her tenure at Lehman Brothers, she was also a founder and leader of the Financial Sponsors Group from 1997 through 2007 and previously was a Managing Director in the Media and Communications Group. She began her career as an Associate at Lehman Brothers in 1987. Ms. L'Esperance is an active promoter of diversity in the workplace and is also a board member of the Boys Club of New York. She is a former director of Jarden Corporation.

**Defendant Strobel**

68.     Defendant Steven J. Strobel ("Strobel") has served as a Company director since 2006, and is the Chair of the Audit Committee. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant Strobel beneficially owned 47,712 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, Strobel owned approximately $2.3 million worth of Newell stock.

69.     For the fiscal year ended December 31, 2017, Defendant Strobel received $280,530 in compensation from the Company, comprised of $135,000 in fees earned or paid in cash, $144,961 in stock awards, and $569 in all other compensation.

70.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Strobel made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 27, 2017 | 5,353 | $  49.38 | $     264,331 |

Thus, in total, before the fraud was exposed, he sold 5,353 Company shares on inside information, for which he received approximately $264,331. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

71.     The Company's 2018 Proxy Statement stated the following about Defendant Strobel:

> **Steven J. Strobel**, age 60, has been the Senior Vice President and Chief Financial Officer of Hill-Rom Holdings, Inc., a holding company focusing on medical technologies and equipment ("Hill-Rom"), since 2014. Prior to his position with Hill-Rom, Mr. Strobel was the Executive Vice President and Chief Financial Officer and a Director of BlueStar Energy Solutions, a retail electricity supplier, from 2009 to 2012, when it was acquired by American Electric Power. Mr. Strobel served as Senior Vice President—Treasurer of Motorola, Inc., a telecommunications company, from 2007 to 2008. He served as Motorola's Senior Vice President—Corporate Controller from 2003 to 2007. From 2000 to 2003, Mr. Strobel was Vice President—Finance and Treasurer for Owens Corning, an insulation, roofing and fiberglass production company. From 1996 to 1999, Mr. Strobel served as Owens Corning's Vice President—Corporate Controller. From 1986 to 1996, Mr. Strobel served in a number of roles with Kraft Foods, including Vice President, Finance, Kraft Grocery Products Division; Vice President and Controller, Kraft USA Operations; and Chief Financial Officer, Kraft Foods Canada. Mr. Strobel has substantial experience in financial matters and leadership in both consumer and industrial markets. Mr. Strobel also has considerable experience with global, multi-divisional business models and a deep understanding of building brands and driving innovation at well-respected companies. He also has substantial institutional knowledge regarding the Company, including its operations and industries, due to his longstanding service to the Board.

**Defendant Todman**

72.     Defendant Michael A. Todman ("Todman") has served as a Company director since 2007 and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant Todman beneficially owned 51,954 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, Todman owned over $2.5 million worth of Newell stock.

73.     For the fiscal year ended December 31, 2017, Defendant Todman received $275,530 in compensation from the Company, comprised of $130,000 in fees earned or paid in cash, $144,961 in stock awards, and $569 in all other compensation.

74.     The Company's 2018 Proxy Statement stated the following about Defendant Todman:

> **Michael A. Todman**, age 60, retired in 2015 as the Vice Chairman of Whirlpool Corporation, a home appliance manufacturing and marketing company ("Whirlpool"), a post he held since 2014. Prior thereto, he served as President, Whirlpool International from 2009 to 2014 and served as a member of the Board of Directors of Whirlpool from 2006 through his retirement in 2015. He served as President, Whirlpool North America from 2007 to 2009, President, Whirlpool International from 2006 to 2007 and Executive Vice President and President of Whirlpool Europe from 2001 to 2006. From 1993 to 2001, he served in a number of roles at Whirlpool, including Executive Vice President, North America; Senior Vice President, Sales and Marketing, North America; Vice President, Sears Sales and Marketing; Vice President, Product Management; Controller of North America; Vice President, Consumer Services, Whirlpool Europe; General Manager, Northern Europe; and Director, Finance, United Kingdom. Prior to joining Whirlpool, Mr. Todman held a variety of leadership positions at Wang Laboratories, Inc., a computer company, and Price Waterhouse and Co., an independent auditing firm. He also serves on the Board of Directors of Brown-Forman Corporation and Prudential Financial and is a former director of Whirlpool. Mr. Todman has distinguished international management experience as well as extensive sales and marketing leadership experience in his career with Whirlpool. He also has substantial institutional knowledge regarding the Company, including its operations and industries, due to his longstanding service to the Board.

**Defendant Viault**

75.     Defendant Raymond G. Viault ("Viault") served as a Company director from 2002 to March 18, 2018, and was a member of the Audit Committee. According to the 2017 Proxy Statement, as of March 20, 2017, Defendant Viault beneficially owned 81,483 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2017 was $48.54, Viault owned approximately $4 million worth of Newell stock.

76.     For the fiscal year ended December 31, 2017, Defendant Viault received $260,530 in compensation from the Company, comprised of $115,000 in fees earned or paid in cash, $144,961 in stock awards, and $569 in all other compensation.

77.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Viault made the following purchase of Company stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |
| February 8, 2017 | 1,630 | $     45.96 | $     74,915 |

During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Viault made the following sale of Company stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |
| February 7, 2017 | 5,353 | $     45.62 | $     244,204 |

Thus, in total, before the fraud was exposed, he sold 5,353 Company shares on inside information, for which he received approximately $244,204. Accounting for the cost of his stock purchases, Defendant Viault received approximately $169,289 during the Relevant Period as a result of his trading in Company stock. His insider sales made with knowledge of material non-public

24

information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

78.    The Company's 2017 Proxy Statement stated the following about Defendant Viault:

> **Raymond G. Viault**, age 72, retired in 2006 as Vice Chairman of General Mills, Inc., a post he held since 1996. From 1990 to 1996, Mr. Viault was President of Kraft Jacobs Suchard in Zurich, Switzerland. Mr. Viault was with Kraft General Foods for a total of 20 years, serving in a variety of major marketing and general management positions. Mr. Viault is a former member of the Board of Directors of Cadbury plc, Safeway Inc. and VF Corp. Mr. Viault has broad experience in global brand building and general management and has substantial expertise in international matters and integration of acquired businesses and has made contributions as a board member of other organizations. He also has substantial institutional knowledge regarding the Company, including its operations and industries, due to his longstanding service to the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

79.    By reason of their positions as officers, directors, and/or fiduciaries of Newell and because of their ability to control the business and corporate affairs of Newell, the Individual Defendants owed Newell and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Newell in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Newell and its shareholders so as to benefit all shareholders equally.

80.    Each director and officer of the Company owes to Newell and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

81.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Newell, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

82.    To discharge their duties, the officers and directors of Newell were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

83.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Newell, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Newell's Board at all relevant times.

84.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual

Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

85.     To discharge their duties, the officers and directors of Newell were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Newell were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Newell's own Code of Business Conduct and Ethics and Code of Ethics for Senior Financial Officers;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Newell conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Newell and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Newell's operations would comply with all applicable laws and Newell's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

86.     Each of the Individual Defendants further owed to Newell and the shareholders the duty of loyalty requiring that each favor Newell's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

87.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Newell and were at all times acting within the course and scope of such agency.

88.     Because of their advisory, executive, managerial, and directorial positions with Newell, each of the Individual Defendants had access to adverse, non-public information about the Company.

89.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Newell.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

90.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

91.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock.

92.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are, or were at relevant times, directors of Newell, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

93.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

94.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Newell and was at all times acting within the course and scope of such agency.

## **NEWELL'S CODE OF CONDUCT**

95.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct"),[12] states that "[o]ur Code applies to all of us," clarifying that this includes:

- Employees of Newell Brands regardless of location, seniority, business division or function

- ***Members of our Board of Directors***

- ***Executive Officers***

- Our third parties, including agents, representatives, independent contractors and consultants, must follow standards equivalent to our Code.

(Emphasis added.)

96.     Regarding waivers thereof, the Code of Conduct provides that:

We all must follow the provisions in our Code. In rare circumstances where you believe that a waiver of a provision of our Code is needed, you must request approval from the Chief Ethics and Compliance Officer. Executive officers and directors must submit waiver requests to the Nominating/Governance Committee

---

[12] The 2017 Proxy Statement and 2018 Proxy Statement refers to the Company's Code of Business Conduct and Ethics. However, the corresponding document available on the Company's website is titled "Code of Conduct."

of the Board of Directors. If approved, Newell Brands will promptly disclose such waivers as required by law.

97.     With respect to compliance with the law, the Code of Conduct provides that: "[w]e count on you to comply with all applicable laws and regulations in each country where we operate."

98.     The Code of Conduct provides, as to "fair and ethical dealing," that:

Every employee must promote positive business relationships. ***Never gain unfair advantage by misleading, misrepresenting or deceiving***.

***We do not participate in false or deceptive advertising of*** our products, services or ***our Company***. Make sure that you are truthful and accurate in promotional materials, including advertising, sales, and marketing communications; and, ensure that you can substantiate any claims that you make.

(Emphasis added.)

99.     The Code of Conduct provides, as to "accurate books and records," in relevant part, that:

**We maintain the accuracy and integrity of our financial reports**

• Follow all internal processes, and the laws, rules and regulations that govern financial accounting and reporting, to accurately record assets, liabilities, revenues and expenses.

• Never intentionally delay recording transactions.

• ***Be honest when making forecasts and make sure that our records and reports accurately reflect our financial position***, as described by the supporting documentation.

• ***Disclosures we make to government entities, such as the U.S. Securities and Exchange Commission, and communications to the business or financial community must be full, fair, accurate, timely, and understandable***.

(Bold heading in original, bold & italic emphasis added.)

100.    The Code of Conduct provides, as to "Avoid insider trading," that:

We may have access to material non-public information about our Company, or companies with which we do business. ***We must never misuse this information***.

**What is material non-public information?**

Information about a company that is not generally known to the public ("inside" information) and that a reasonable investor would consider relevant in making investment decisions. ***Inside information should be considered non-public until there is a formal press release or document filed with the U.S. Securities and Exchange Commission (SEC) disclosing the information***. Certain information filed with the SEC may not be public, so contact the Legal Department if you are uncertain.

**What is insider trading?**

When someone uses inside information to gain profits or avoid losses in the stock market. ***Our Company takes our obligations under all Securities laws seriously. Never buy or sell stock or other securities on the basis of inside information*** or "tip" others so that they may do so.

(Bold subheadings in original, bold & italic emphasis added.)

101.    The Code of Conduct provides, as to reporting violations thereof, that: "If you have a question, a concern, or suspect a possible violation of our Code, speak up and talk to someone who can assist you." The Code of Conduct clarifies that "[w]e all have a responsibility to report actual or suspected violations of our Code of Conduct."

102.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Several of the Individual Defendants violated the code by selling shares of Company stock while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## NEWELL'S CODE OF ETHICS FOR SENIOR FINANCIAL OFFICERS

103.   The Company also maintains a Code of Ethics for Senior Financial Officers ("Code of Ethics"). As stated therein:

> ***The purpose of the Code is: to promote the honest and ethical conduct of the Senior Financial Officers*** (as defined below), including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; ***to promote full, fair, accurate, timely and understandable public disclosures by the Company; and to promote compliance with all applicable laws, rules and regulations***.

(Emphasis added.)

104.   The Code of Ethics applies to the Company's CEO, CFO,  CAO "and any persons performing similar functions (together the 'Senior Financial Officers')." The Code of Ethics notes that it is in addition to the Code of Conduct, and states, in relevant part:

> While the Company expects honest and ethical conduct in all aspects of business from all of its employees, it expects the highest possible honest and ethical conduct from the Senior Financial Officers. The honesty, integrity and sound judgment of Senior Financial Officers is fundamental to the Company's reputation and success. Compliance with this Code is a condition of employment, and violations of the Code may result in disciplinary action, up to and including termination of employment.

105.   The Code of Ethics requires that Senior Financial Officers shall, to the best of their ability:

> • ***Act with honesty and integrity***, avoiding actual or apparent conflicts of interest between personal and professional relationships;

> • Disclose to the General Counsel, the Chairman of the Audit Committee or the Vice President-General Auditor any material transaction or relationship that reasonably could be expected to give rise to such a conflict of interest;

> • ***Provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company***;

> • ***Comply with applicable governmental laws, rules and regulations***;

• Support, as appropriate, contact by employees with the General Counsel or the Audit Committee for any issues concerning the improper accounting or financial reporting of the Company without fear of retaliation; and

• Refrain from unduly or fraudulently influencing, coercing, manipulating or misleading any authorized audit and from interference with any auditor engaged in the performance of an internal or independent audit of the Company's financial statements or accounting books and records.

(Emphasis added.)

106.     The Code of Ethics provides, regarding reporting violations thereof, that:

If you know of or suspect a violation of applicable laws or regulations or of this Code, you must promptly report that information to the General Counsel, the Chairman of the Audit Committee or the Vice President-General Auditor. *No one will be subject to retaliation because of a good faith report of a suspected violation.*

107.     In violation of the Code of Ethics, Defendants Polk, Nicoletti, and Cunningham conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Defendant Cunningham also violated the Code of Ethics by selling shares of Company stock while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Ethics, Defendants Polk, Nicoletti, and Cunningham failed to maintain the accuracy of Company records and reports, comply with laws and regulations, act with honesty and integrity, and properly report violations of the Code of Ethics.

## **BACKGROUND**

108.     The product of a 2016 merger between Newell Rubbermaid and Jarden, Newell designs, manufactures, sources, and distributes consumer and commercial products worldwide, including household names such as Sharpie, Yankee Candle, and Elmer's Glue.

109.    Newell has a global supply chain and sales footprint, limiting the Company's ability to respond nimbly to changes in market signals.

110.    A large proportion of the Company's sales are in the United States, and its sales in the United States are largely concentrated in a group of 20 retailers.

111.    The following chart, included in the Company's annual report for the fiscal year ended December 31, 2016, filed with the SEC on Form 10-K on March 1, 2017 reflects that in 2016, the Company's business was run in nine operating segments:

| Segment | Key Brands | Description of Primary Products |
|---|---|---|
| Writing | Sharpie®, Paper Mate®, Expo®, Prismacolor®, Mr. Sketch®, Elmer's®, X-Acto®, Parker®, Waterman®, Dymo® Office | Writing instruments, including markers and highlighters, pens and pencils; art products; activity-based adhesive and cutting products; fine writing instruments; labeling solutions |
| Home Solutions | Rubbermaid®, Contigo®, bubba®, Calphalon®, Goody® | Indoor/outdoor organization, food storage and home storage products; durable beverage containers; gourmet cookware, bakeware and cutlery; hair care accessories |
| Tools | Irwin®, Lenox®, hilmor™, Dymo® Industrial | Hand tools and power tool accessories; industrial bandsaw blades; tools for HVAC systems; label makers and printers for industrial use |
| Commercial Products | Rubbermaid Commercial Products® | Cleaning and refuse products; hygiene systems; material handling solutions |
| Baby & Parenting | Graco®, Baby Jogger®, Aprica®, Teutonia® | Infant and juvenile products such as car seats, strollers, highchairs and playards |
| Branded Consumables | Yankee Candle®, Waddington, Ball®, Diamond®, First Alert®, NUK®, Quickie®, Pine Mountain® | Branded consumer products; consumable and fundamental household staples |
| Consumer Solutions | Crock-Pot®, FoodSaver®, Holmes®, Mr. Coffee®, Oster®, Rainbow®, Sunbeam® | Household products, including kitchen appliances and home environment products |
| Outdoor Solutions | Coleman®, Jostens®, Berkley®, Shakespeare®, Rawlings®, Völkl®, K2®, Marmot® | Products for outdoor and outdoor-related activities |
| Process Solutions | Jarden Plastic Solutions, Jarden Applied Materials, Jarden Zinc Products | Plastic products including container closures, contact lens packaging, medical disposables, plastic cutlery and rigid packaging |

112.    However, effective January 1, 2017 the Company began reporting its financial results in five segments, as demonstrated by the following chart reproduced from the Form 10-Q for the fiscal quarter ended March 31, 2017 that Newell the Company filed with the SEC on May 10, 2017:

| Segment | Key Brands | Description of Primary Products |
|---------|-----------|-------------------------------|
| Live | Aprica®, Baby Jogger®, Ball®, Calphalon®, Crock-Pot®, FoodSaver®, Graco®, Holmes®, Mr. Coffee®, NUK®, Oster®, Rubbermaid®, Sunbeam®, Tigex®, Yankee Candle® | Household products, including kitchen appliances, gourmet cookware, bakeware and cutlery, food storage and home storage products, fresh preserving products, home fragrance products; baby gear, infant care and health products; home environment products and durable beverage containers |
| Learn | Dymo®, Elmer's®, Expo®, Jostens®, Mr. Sketch®, Paper Mate®, Parker®, Prismacolor®, Sharpie®, Waterman®, X-Acto® | Writing instruments, including markers and highlighters, pens and pencils; art products; activity-based adhesive and cutting products; fine writing instruments, labeling solutions and a variety of support products for schools |
| Work | Mapa®, Quickie®, Rainbow®, Rubbermaid®, Rubbermaid Commercial Products®, Spontex®, Waddington | Cleaning and refuse products; hygiene systems; material handling solutions, consumer and commercial totes and commercial food service and premium tableware products |
| Play | Berkley®, Coleman®, Contigo®, Ex Officio®, Marmot®, Rawlings®, Shakespeare® | Products for outdoor and outdoor-related activities |
| Other | Jarden Plastic Solutions, Jarden Applied Materials, Jarden Zinc Products, Goody®, Bicycle®, Rainbow®, K2®, Völkl® | Plastic products including closures, contact lens packaging, medical disposables, plastic cutlery and rigid packaging, beauty products, gaming products and winter sport products |

113.    Despite this change, certain Individual Defendants, in particular Defendant Polk, continued to refer to the Company's operating results by reference to the pre-2017 reporting segments during the Relevant Period.

### SEC Disclosure Requirements

114.    Item 1A of Forms 10-K and 10-Q require registrants to provide information required by Item 503 of Regulation S-K, 17 C.F.R. §229.503, Risk Factors. Item 503 requires disclosure of the most significant matters that create risk in investing in a company's stock.

115.    In filing periodic financial statements with the SEC, Item 7 of Form 10-K and Item 2 of Form 10-Q require that registrants provide *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A"). Regulation S-K, 17 C.F.R. §229.303, which also applies to proxy statements, requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

116.    As noted in the instructions to Item 303(a), registrants must disclose and "focus specifically" on material events and uncertainties that would cause the historical financial information about the Company not to be necessarily indicative of future operating results. This includes "matters that would have an impact on future operations and [matters that] have not had an impact in the past." The instructions state, in relevant part:

> The discussion and analysis shall ***focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results*** or of future financial condition. ***This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past***, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

(Emphasis added.)

117.    The SEC issued an interpretive release to Item 303 of Regulation S-K on May 18, 1989 (the "1989 Interpretive Release"). The 1989 Interpretive Release clarifies that there is a duty to disclose where a demand, trend, commitment, uncertainty or event is both presently known to management and reasonably likely to have a material effect on either the registrant's financial condition or results of operation. The 1989 Interpretive release states, in relevant part:

> ***A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation***.

* * *

> ***Events that have already occurred or are anticipated often give rise to known uncertainties***. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. ***In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required***.[13]

(Emphasis added.)

118.    On December 19, 2003, the SEC issued an interpretive release to Item 303 of Regulation S-K, with an effective date of December 29, 2003 (the "2003 Interpretive Release"). The 2003 Interpretive Release established that the Registration Statement was required to disclose known demands, events, or uncertainties, except for those that management determined: (1) were not reasonably likely to occur; or (2) would not have a material effect on the Company's operating results. The 2003 Interpretive Release states, in pertinent part:

> As we have explained in prior guidance, ***disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition***, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.[14]

119.    Item 9A of Forms 10-K and 10-Q require registrants to provide information required by Item 307 of Regulation S-K, 17 C.F.R. §229.307, *Disclosure Controls and*

---

[13] *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Release Nos. 33-6835 and 34-26831, 1989 SEC LEXIS 1011, at *13, *18 (May 18, 1989) (footnote omitted).

[14] *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release Nos. 33-8350 and 34-48960, 2003 SEC LEXIS 3034, at *36 (Dec. 19, 2003) (footnote omitted).

*Procedures*. Item 307 required that the Company's CEO and CFO's conclusions about the effectiveness of Newell's disclosure controls be reported. Under 17 C.F.R. §240.13a-15(e):

> the term disclosure controls and procedures means ***controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits*** under the Act (15 U.S.C. 78a et seq.) ***is recorded, processed, summarized and reported,*** within the time periods specified in the Commission's rules and forms. ***Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.***

(Emphasis added.)

### False and Misleading Statements During the Relevant Period

***February 6, 2017 Press Release and Conference Call***

120.    On February 6, 2017, before markets opened, the Individual Defendants caused the Company to issue a press release announcing its financial results for the year and quarter ended December 31, 2016. For the quarter, the Company reported net sales of $4.14 billion, representing net sales growth of 165% and core sales growth of 2.5%. For fiscal year 2016, the Company reported net sales of $13.26 billion, representing net sales growth of 124.2% and core sales growth of 3.7%. The press release quoted Defendant Polk as stating, in relevant part:

> Our ***fourth quarter results reflect continued strong progress in the company's transformation*** . . . We delivered over 40 percent earnings per share growth and nearly $1 billion of operating cash flow, driven by accelerating cost savings from synergies and Project Renewal. Despite significant portfolio and organization change in the quarter, ***core sales growth was competitive led by very good growth on Writing, Baby, Beverages, Waddington, Fishing, Team Sports and Technical Apparel. We delivered this outcome in the context of challenging mall-based retail conditions driven by accelerating bricks-to-clicks shopper migration during the holidays.***
>
> This has been one of the most transformative years in our history . . . In the context of unprecedented change, ***we have delivered very strong full year results with core sales growth of 3.7 percent*** and normalized earnings per share growth of nearly 33

percent. We have made tremendous progress on our strategic initiative to strengthen our portfolio, acquiring businesses with over $10 billion in revenue and divesting or holding for sale businesses with about $1.6 billion in revenue. ***Our progress on costs has enabled us to improve normalized operating margin by over 100 basis points while simultaneously investing for future growth by strengthening our capabilities in insights, design, innovation and ecommerce.*** And we have rapidly deleveraged our balance sheet, reducing gross debt by nearly $2.1 billion since the creation of Newell Brands on April 15, 2016. As we head into 2017, we are confident that we will continue to rapidly deleverage while simultaneously putting the building blocks in place to drive the growth acceleration and transformative value creation promised in the Growth Game Plan.

(Emphasis added.)

121.    Also on February 6, 2017, the Company held a conference call with analysts and investors to discuss the Company's financial results for the quarter and year ended December 31, 2016. Defendant Polk asserted during the call that the Company's financial plans and projections accounted for existing macroeconomic challenges, stating, in relevant part:

As you all know, ***the macro environment has not been the most favorable over the last few years*** with slow GDP growth compounded by foreign exchange headwinds. ***While we may soon*** reach an inflection point where we ***begin to see more favorable GDP growth, our plans do not count on that happening this year***. We take confidence in the fact that we've always handled macro and other challenges in stride and you can count on us to do our best to do the same this year.

(Emphasis added.)

122.    In discussing Newell's guidance for 2017, Defendant Polk noted that the Company's financial projections for 2017 accounted for challenges in the retail environment, including consumer's changing preferences for online shopping over bricks-and-mortar retail and the concomitant changes to the retail landscape. Defendant Polk stated, in relevant part:

This morning we updated our 2017 full-year guidance for core sales growth and normalized EPS and provided guidance for the first time on full-year net sales. We've added net sales guidance range in 2017 given the scope of mergers and acquisitions activity and the continued volatility of foreign exchange.

Our outlook for 2017 net sales is $14.52 billion to $14.72 billion, which represents 9.5% to 11% net sales growth compared to prior year. The guidance reflects our current expectations for the timing of acquisitions and divestitures, the latest view

of foreign exchange which has worsened from our prior guidance and our latest view of core sales growth.

The Company has adjusted its 2017 full-year guidance range for core sales growth to 2.5% to 4%, lowering the bottom of the range from the original guidance of 3%. ***This revised outlook reflects our expectation of continued bricks-to-clicks shopper migration, causing some retailers to rebalance store count, reduce inventories, and reconfigure ordering patterns***, as some retailers did after Black Friday this past quarter. ***The 25 basis point reduction in the midpoint of the core sales growth range is necessary to accommodate*** recently announced store count reductions and ***our new expectations for inventory rebalancing***. ***We expect this rebalancing to be more pronounced in the first half of 2017 and to lessen in the second half of 2017***, as we lapped this past year's changes.

In this context, ***we believe core sales growth will sequentially accelerate with the core growth in the first half of the year in the lower half of the full-year guidance range***. We expect the first-quarter growth rate to be roughly in line with the fourth quarter of 2016, as we start up our new organization.

(Emphasis added.)

### *Consumer Analyst Group of New York Conference*

123.    Defendant Polk spoke at the Consumer Analyst Group of New York conference on February 24, 2017, during which he made materially false and misleading statements regarding the Company's growth and channel inventory. For example, the slide deck for the conference included the following table projecting strong sales growth in 2017 and beyond:

|  | 2017 Full YR Guidance[1] | 2018 to 2021[2] |
| --- | --- | --- |
| Core Sales Growth | 2.5% to 4.0% | 3.0% to 5.0% |
| Net Sales | $14.52b to $14.72b | ~3.0% CAGR |
| Normalized EPS | $2.95 to $3.15 | double digit CAGR |

### *2016 10-K*

124.    On March 1, 2017, the Company filed with the SEC its report for the fiscal quarter and year ended December 31, 2016 on a Form 10-K (the "2016 10-K"), which was signed by

Defendants Polk, Nicoletti, Cunningham, Cowhig, Ashken, Clarke, Conroy, Cowen, De Sole, Franklin, L'Esperance, Strobel, Todman and Viault.

125.    The 2016 10-K contained risk disclosures that characterized then existing risks as potential risks, including the risk that Newell's existing customers would change their purchase quantities:

> **The Company's sales are dependent on purchases from several large customers and any significant decline in these purchases or pressure from these customers to reduce prices could have a negative effect on the Company's future financial performance.**
>
> The Company's customer base is relatively fragmented. Although we have long-established relationships with many customers, the Company generally does not have any long-term supply or binding contracts or guarantees of minimum purchases with its largest customers. Purchases by these customers are generally made using individual purchase orders. As a result, these customers may cancel their orders, change purchase quantities from forecast volumes, delay purchases for a number of reasons beyond the Company's control or change other terms of the business relationship. Significant or numerous cancellations, reductions, delays in purchases or changes in business practices or by customers could have a material adverse effect on the Company's business, results of operations and financial condition. In addition, because many of the Company's costs are fixed, a reduction in customer demand could have an adverse effect on the Company's gross profit margins and operating income.

126.    The 2016 10-K continued, mischaracterizing then-existing risks related to the Jarden integration as "potential." The 2016 10-K stated, in relevant part:

> **The Company's plans to continue to improve productivity and reduce complexity and costs may not be successful, which would materially adversely affect its ability to compete.**
>
> The Company's success depends on its ability to continuously improve its manufacturing operations to gain efficiencies, reduce supply chain costs and streamline or redeploy nonstrategic selling, general and administrative expenses in order to produce products at a best-cost position and allow the Company to invest in innovation and brand building, including advertising and promotion. ***The Company is currently in the process of*** implementing Project Renewal and ***delivering the cost synergies related to the acquisition of Jarden***. Both efforts are global initiatives designed to reduce the complexity of the organization and increase investment in the Company's most significant growth platforms. Project Renewal and the Company's cost saving plans associated with the Jarden integration may

not be completed substantially as planned, may be more costly to implement than expected, or may not result in, in full or in part, the positive effects anticipated. In addition, such initiatives require the Company to implement a significant amount of organizational change, which could have a negative impact on employee engagement, divert management's attention from other concerns, and if not properly managed, impact the Company's ability to retain key employees, cause disruptions in the Company's day-to-day operations and have a negative impact on the Company's financial results. It is also possible that other major productivity and streamlining programs may be required in the future.

(Bold heading in original, bold & italic emphasis added.)

127.    The 2016 10-K contained an MD&A section that was false and misleading due to the Company's failure to disclose, at least, that: (1) the Company's retail customers were holding high levels of unsold inventory of Newell products; (2) as a result of these excess inventories, Newell was subject to an increased risk that sales growth would be lower in future reporting periods; (3) the Company's sales figures in the early part of the Relevant Period were due, in part, to significant discounts provided to Newell's customers that exacerbated high levels of unsold inventory; and (4) operational and cultural differences between Newell and Jarden were causing internal strife and limiting synergies from the Jarden acquisition.

128.    The 2016 10-K asserted that management had concluded that the Company's internal control over financial reporting was effective as of December 31, 2016, stating, in relevant part:

**ITEM 9A. CONTROLS AND PROCEDURES**

(a) Evaluation of Disclosure Controls and Procedures: as of December 31, 2016, an evaluation was performed by the Company's management, under the supervision and with the participation of the Company's chief executive officer and chief financial officer, of the effectiveness of the Company's disclosure controls and procedures. Based on that evaluation, the chief executive officer and the chief financial officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2016.

129.    Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Polk and Nicoletti attesting to the accuracy of the 2016 10-K.

*2017 Proxy Statement*

130.    On March 30, 2017, the Company filed the 2017 Proxy Statement. Defendants Ashken, Clarke, Conroy, Cowen, Cowhig, De Sole, Franklin, L'Esperance, Polk, Strobel, Todman, and Viault solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[15]

131.    Regarding the Company's Code of Ethics, the 2017 Proxy Statement noted that:

The Board of Directors has adopted a "Code of Ethics for Senior Financial Officers," which is applicable to the Company's senior financial officers, including the Company's principal executive officer, principal financial officer, principal accounting officer and controller. The Company also has a separate "Code of Business Conduct and Ethics" that is applicable to all Company employees, including each of the Company's directors and officers. Both the Code of Ethics for Senior Financial Officers and the Code of Business Conduct and Ethics are available under the "Corporate Governance" link under the "Investor Relations" tab on the Company's website at *www.newellbrands.com*. The Company posts any amendments to or waivers of its Code of Ethics for Senior Financial Officers or to the Code of Business Conduct and Ethics (to the extent applicable to the Company's directors or executive officers) at the same location on the Company's website. . . .

132.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code Conduct and Code of Ethics were not followed, as multiple Individual Defendants engaged in insider trading while allowing false and misleading statements to be issued to the investing public.

---

[15] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

133.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements based on, *inter alia*, earnings per share and total shareholder return, while failing to disclose that such measures were being artificially inflated by the Individual Defendants' false and misleading statements and repurchases of Company stock, and therefore any compensation based on the Company's financial performance was artificially inflated. The 2017 Proxy Statement stated, in relevant part:

> In making compensation decisions, the Committee considers a number of factors including competitive market data, individual and Company performance, skills, experience, complexity and criticality of role and internal pay equity. The Committee does not use a predetermined formula to make its overall decisions but takes into account all the above factors. However, ***in deciding each performance-based component of compensation for the Company's named executive officers, generally including annual incentive and long-term incentive compensation, the Committee in 2016 tied payment to normalized earnings per share, core sales growth, normalized EBITDA and TSR*** [total shareholder return]***.*** Such performance goals are intended to align the majority of each executive officer's compensation with stockholders' interests over the near and long term.
>
> * * *
>
> **Mix of Pay**
>
> To reinforce the Company's pay for performance philosophy, ***generally more than 85% of targeted total direct compensation for each named executive officer is contingent upon performance. As a result, total direct compensation fluctuates with the Company's financial results and share price***. The Committee believes this approach motivates executives to consider the impact of their decisions on stockholder value.
>
> To increase alignment with Company performance, executives receive performance-based RSUs (rewards TSR performance relative to the custom comparator group). Overlapping performance cycles for the performance-based RSU awards are designed to incentivize sustainable long-term performance. In 2016, each of the named executive officers received 100% of the value of his or her LTIP award in performance-based RSUs.

(Bold subheading in original, bold & italic emphasis added.)

134.    The 2017 Proxy Statement also failed to disclose that: (1) the Company's retail customers were holding high levels of unsold inventory of Newell products; (2) as a result of these

excess inventories, Newell was subject to an increased risk that sales growth would be lower in future reporting periods; (3) the resulting adverse effects on sales were specific to Newell, rather than the result of a macroeconomic trends, as represented by the Individual Defendants; (4) the Company's sales figures in the early part of the Relevant Period were due, in part, to significant discounts provided to Newell's customers that exacerbated high levels of unsold inventory; (5) operational and cultural differences between Newell and Jarden were causing internal strife and limiting synergies from the Jarden acquisition; (6) risks associated with the Company's long supply chain prevented Newell from responding quickly to market signals; (7) Newell's business fundamentals were not improving, contrary to representations made during the Relevant Period by certain of the Individual Defendants; (8) the Company failed to maintain internal controls; and (9) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *May 8, 2017 Press Release and Conference Call*

135.   On May 8, 2017, before markets opened, the Individual Defendants caused the Company to issue a press release announcing its financial results for the quarter ended March 31, 2017 and reaffirming Newell's  previously-issued 2017 sales growth guidance of 2.5% to 4%. For the quarter, the Company reported net sales of $3.3 billion, representing net sales growth of 148.4% and core sales growth of 2.5%. The press release quoted Defendant Polk as stating, in relevant part:

> Our first quarter results provide ***strong evidence of our team's capacity to perform while we transform*** . . . We delivered competitive core sales growth of 2.5 percent despite significant organization and portfolio change. Our core sales results were broad based with growth in all four regions and across four of five segments. ***Our international growth coupled with very strong e-commerce results more than offset the continuing impact of inventory de-stocking in U.S. mass channels***. ***Our operating margin was well ahead of plan driven by strong cost synergies*** and stringent discretionary cost management. And we further deleveraged, paying

down over $725 million of debt in the quarter, bringing our cumulative debt repayment since the Jarden transaction on April 15, 2016 to $2.8 billion.

We have had a good start to 2017 and are on our way to unlock the transformative value creation associated with our long term guidance. ***We are confident that simultaneous growth and margin development fueled by savings and synergies will generate strong cash flow***, leading to rapid deleveraging and then more aggressive value-creating uses of capital. We believe this transformative value creation story is unique to Newell Brands given our leading brand positions in large global categories, the inherent opportunities presented through the new scale of the company, the investments we are making in new capabilities and the strong cash generative nature of our businesses. This confidence is shared by our Board of Directors which has approved a 21 percent increase of the quarterly dividend to $0.23 per share.

(Emphasis added.)

136.    Later, and also on May 8, 2017, the Company held a conference call with analysts and investors to discuss the Company's financial results for the quarter ended March 31, 2017. Regarding retailers' efforts to reduce inventory on hand, Defendant Polk stated that: "[w]hile inventory reduction by U.S. retailers was a meaningful headwind in the first quarter, I'm encouraged by how well our business has delivered through this turbulence."

137.    Defendant Polk again re-affirmed 2017 projected sales growth of 2.5% to 4% during the call, stating, in relevant part:

> ***We're also making good progress and expect to deliver competitive levels of core growth towards the middle of our full year guidance range***. Our core growth delivery will be dependent on excellent execution of our growth priorities, continued strong e-commerce growth and continued market share gains in an environment of modest category growth.
>
> Despite withstanding substantial inventory pressure over the last six months, ***we're beginning to realize many of the revenue opportunities of the combination.*** We also see the benefits of our investments in e-commerce, design, innovation and brand building yielding strengthened new product, new distribution and new marketing plans in many of the businesses.
>
> * * *
>
> ***So while we're mindful of the challenging retailer environment and the potential for more retailer turbulence through the second quarter***, *our confidence in our*

*delivery is grounded in the knowledge that we have a leading portfolio of brands*, we have advantaged capabilities in innovation and design, a peer-group-leading e-commerce organization, a long list of opportunities for international deployment and core distribution, the scale to outspend and out-execute our competition and *a world-class team working on realizing the savings and cash benefits of the Jarden combination, and a track record of integrating new acquisitions with cost and revenue benefits quickly captured. This is a proven model and playbook that we've executed before, and we're confident we can again.*

(Emphasis added.)

138.    A participant asked a question regarding channel inventory destocking during the call. In response, Defendant Polk asserted that the effects of channel inventory reductions were "behind" the Company, attributing inventory pressure to retailers' moves toward an e-commerce model. Defendant Polk stated, in relevant part:

So, *the inventory reduction impacts were broad based. Some of those are masked in our numbers because we had really strong performance in certain other aspects of the business.* So even in Writing, we saw the distributor pressure on pencils and pens, but we had great momentum on markers behind Sharpie fine art, behind the Expo ink indicator, geographic expansion of Sharpie to Mexico and France. We've got a lot of things going on in these businesses. But pressure, even within Writing now, because of the momentum on markers, because of the momentum – continued momentum on glue connected to slime, we were able to overcome that. *The good news is that these things are now behind us.* And eventually, we lap these scenarios as we come into '18, which will serve us well. In the distributive trade, we saw pressure across the distributive trade for a couple of reasons. *One is just basic inventory pressure in that channel,* but you have to ask the question why. And *what's going on there is similar to what's going on in retail, which is the B2B e-platforms are impacting those channels.*

\* \* \*

We expect more headwinds in the second quarter connected to the retailer transitions that are occurring. *We were successful in overcoming that headwind in Q1 as a result of the diversity of our portfolio and channels, as a result of the share gains in the modest-growing categories, as a result of the broad-based growth* in the international contribution and as a result of the tremendous surge in momentum we have in e-commerce. So those four variables contributed to our ability to deal with the acute issue that's happening -- was happening on the inventories in the U.S. . . . As I said, *we expect that to continue into Q2.* We don't know for how long, but we expect it to continue, *and we're assuming it does in our planning*. These things are not as -- these types of issues are not as smooth and predictable as you'd like them to be, but we've got that built into our thinking.

(Emphasis added.)

### *Q1 2017 10-Q*

139.    On May 10, 2017, the Company filed with the SEC its report for the fiscal quarter ended March 31, 2017 on Form 10-Q (the "Q1 2017 10-Q"), which was signed by Defendants Nicoletti and Cunningham.

140.    The Q1 2017 10-Q contained and MD&A section, which was false and misleading for the same reasons as the 2016 10-K.

141.    Regarding "Quantitative and Qualitative Disclosures about Market Risk," the Q1 2017 10-Q stated that: "[t]here have been no material changes from the information previously reported under Part II, Item 7A. in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2016."

142.    The Q1 2017 10-Q asserted that Newell's disclosure controls and procedures were effective, stating, in relevant part:

**Item 4. Controls and Procedures**

As required by Rule 13a-15(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of its disclosure controls and procedures as of the end of the period covered by this Quarterly Report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) were effective as of the end of the period covered by this Quarterly Report.

As required by Rule 13a-15(d) under the Exchange Act, the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the Company's internal control over financial reporting to determine whether any changes occurred during the quarter covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Based on that evaluation, there have been no such changes during the quarter covered by this Quarterly Report.

143.     Attached to the Q1 2017 10-Q were SOX certifications signed by Defendants Polk and Nicoletti attesting to its accuracy.

***August 4, 2017 Press Release and Conference Call***

144.     On August 4, 2017, before markets opened, the Individual Defendants caused the Company to issue a press release announcing its financial results for the quarter ended June 30, 2017 and once again reaffirming Newell's  previously-issued 2017 sales growth guidance of 2.5% to 4%. For the quarter, the Company reported net sales of $4.1 billion, representing net sales growth of 5.1% and core sales growth of 2.5%. The press release quoted Defendant Polk as stating, in relevant part:

> ***We achieved a solid set of results in the second quarter delivering competitive growth***, good margin development and strong earnings . . . We increased market share by sixty basis points in our large U.S. business, drove continued double digit growth of our global e-commerce business and once again delivered broad-based geographic results with core sales growth in all four regions. Normalized operating margin increased by one hundred and thirty basis points, enabled by more than $80 million of incremental cost savings and synergies, which contributed to our delivery of double digit normalized earnings per share growth.
>
> ***We expect core sales growth to strengthen in the second half of the year as we benefit from new distribution gains, a stronger back half pipeline of innovations*** and sustained double digit growth in e-commerce. We remain confident in our unique long term value creation opportunity for simultaneous growth and margin development and expect strong cash flow generation to enable delivery of our leverage ratio targets well ahead of our committed timetable.

 (Emphasis added.)

145.     Later, and also on August 4, 2017, the Company held a conference call with analysts and investors to discuss the Company's financial results for the quarter ended June 30, 2017. Regarding the Company's sales growth, Defendant Polk stated that: "[c]ore sales growth was broad-based, with growth in all geographies," explaining that but for retailer inventory destocking in the Learn and Play segments of Newell's business, sales growth would have been even higher. Defendant Polk assured call participants that "with this strong back half, ***we expect***

*to deliver core sales growth acceleration into the second half of the year in the upper half of our*

*full year core sales growth guidance range, with sequential acceleration in our growth rate from*

*Q3 to Q4*."[16]

146.    Defendant Polk assured call participants that negative consequences of excess retail

inventory to macroeconomic factors rather than issues within Newell, stating, in relevant part:

> More broadly, *the fundamentals are good across the business and are improving as we head into the second half of the year*. That said, *like most others in our industry, we continue to face pressure from retailer inventory reductions and retailer consolidation in the U.S.* And sometimes, the impact can be pretty sharp.

(Emphasis added.)

147.    In response to an analyst's question about whether the projected increase in core

sales growth during the latter half of 2017 would be attributable to Jarden or legacy Newell

business, Defendant Polk asserted that growth would transpire "across a number of different

business[es]" and that there was "a broad section of activity coming."

> *It's a pretty good balance*, although I want to be clear. The things that we're launching are things that don't really tie to the big investments we've made in insights. Those -- that work to fill the innovation funnel really will yield in the middle of 2018. So that upside is still in front of us. But *we actually have some very strong and exciting things going on across a number of different businesses*. We've got a very big launch on Cookware. . . . We've got Baby Gear launches in Canada. In the U.S., we got a really cool new stroller launching that we call UNO2DUO, . . . . We've got some exciting new stuff coming on Writing connected to coloring and gifting in the fourth quarter.
>
> So, we've got *-- you've got a broad section of activity coming*, plus we have a tremendous amount of marketing and merchandising activity set up around Back-to-School, of course, and around Black Friday. So, the back half was always going to be the more loaded half of the year for us for two reasons. It's natural – it matches the natural flow of our business, but also in the first half of the year, we've been changing basically everything. The entire organization, new people, new roles, consolidating structures. So, this wasn't the period of time to be launching a lot of new items into the market. So, it's the natural phasing in our business and the

---

[16] Emphasis added.

natural phasing of our -- in connection to the natural phasing of our change
program.

(Emphasis added.)

148.   Defendant Polk continued, reaffirming the Company's projections for 2017, and

asserting that the Company's model for the remainder of 2017 assumed "no major retail-driven

disruptions," and that "we are well aware of where the issues are." Defendant Polk stated, in

relevant part:

> ***Our outlook for the back half of the year hasn't really changed.*** We're always
> calling acceleration and performance. We never got quite as specific to say
> sequential improvement between Q3 and Q4, but that was always the profile, the
> plan, as you would expect because of the flow of activity, but in the time between
> the changes we've made in the first half. So, I think that would be my answer on
> core sales growth. And we'll see. Maybe someday in the future, we'll have a 5%.
> But I think that doesn't happen until we get into the thick of our innovation activity
> on the legacy Jarden businesses. But more to come on '18 and beyond, when we
> get a little bit closer to that timeframe.
>
> The other thing that I said in the speech, in the script, was that ***this presumed no
> major retail-driven disruptions in the back half of the year. And I think that's a
> good assumption to make.*** We've experienced many of them. I think we – ***other
> than a surprise bankruptcy, I think we are well aware of where the issues are.***
> And I think we've contemplated -- particularly given the things we've been able to
> do in Q2 in Writing, ***we contemplated the risk profile that could emerge from
> office superstores in the back half of the year. So, I think we have well in hand,***
> but again, ***our guidance would be disrupted by a major bankruptcy. But, again, I
> don't see that. The profile of our retailer base is such that it doesn't look like
> there's anybody in our top 15 for sure that would ever be in that circumstance.***

(Emphasis added.)

149.   When an analyst inquired about the impact of retailer destocking on the Company's

financial results for the latter half of 2017, Defendant Polk assured participants that to adversely

impact the Company's results for the quarter ended September 30, 2017, the retail environment

would have to become "materially worse" than in 2016. Defendant Polk stated, in relevant part:

> We're in the middle of what has been a structural change in retailer attitudes that
> started in the fourth quarter of last year. As you'll recall, we missed a replenishment
> order on Appliances after Black Friday. There was a $24 million order at Walmart.
> And the good news is, as we come through Q3, we lapped the vast majority of

[retailer inventory reductions], which means that all of these changes are now in the base. And so, *the environment would have to get materially worse than last year's environment for us to face headwinds from Q4 onward*. So that's our view of the view forward. We may not be precise or right. There's certainly some structural things out there that we've been living with for years: office superstore contraction, the rebalancing of that retail landscape. We've done very, very well in our Writing business in the context of that. So, I say what I say *recognizing that there is certainly more to come in this space, but I don't think it has as profound an impact on the business as the last three quarters, that 1Q through 3Q, the last year has had*. This will go down as one of those cycles that the industry goes through. *And once we get through the fourth -- and into the fourth quarter, I think the degree of impact lessens*.

(Emphasis added.)

150.    Finally, regarding the 2017 back-to-school shopping season, Defendant Polk stated:

*This is actually the most favorable July 4th treatment we could have for a Q2 sell-in*. So, I've read some of the commentary; I don't quite get that. I think what people are referring to, I think in some of their commentary is that it's just sort of a shortcut to an explanative. I think there's been a fair month of inventory rebalancing in the distributive trade in an office superstore channel that's gone on in the first half of the year in the stationary categories. I think that's the primary things. I don't think Back-to-School timing. This is about the most favorable structure you could have for a Q2 sell-in for Back-to-School, because of the fact that July 4th was a Tuesday and the merchandise for July 4th was on the floor. So, there was room in our retailer warehouses for us to sell-in inventory at the end of the quarter. So, we don't see any timing-related shift. That said, there's always different behaviors on the part of retailers with respect to their merchandising activity. So, I was referring to sell-in timing. There's certain retailers that have gone early this year and one retailer, in particular, that's gone later than they went last year in the office superstore channel. And we'll see how that all plays out over time. To your point, while schools open in many states in the Midwest now this week -- and think in some of the Southern states it starts to open next week, so Back-to-School has happened in the Northeast. And then out West, it's still -- we're still ramping into that window.

But *our early numbers look pretty good*. And *based on the aggregate selling in Q2 on Writing, we would expect a really good sellout*. And we'll look and watch order patterns in September, presuming that our share momentum continues and we get the sellout, which we should, then we'll watch that order pattern dynamic at the end of September into October, again, to see whether there's any rebalancing. We think we've made a prudent assumption in our guidance for Q3, but you really don't know until the very, very end.

(Emphasis added.)

*Q2 2017 10-Q*

151.    On August 9, 2017, the Company filed with the SEC its report for the fiscal quarter ended June 30, 2017 on Form 10-Q (the "Q2 2017 10-Q"), which was signed by Defendants Nicoletti and Cunningham.

152.    The Q2 2017 10-Q contained and MD&A section, which was false and misleading for the same reasons as the 2016 10-K.

153.    Regarding "Quantitative and Qualitative Disclosures about Market Risk," the Q2 2017 10-Q stated that: "[t]here have been no material changes from the information previously reported under Part II, Item 7A. in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2016."

154.    The Q2 2017 10-Q asserted that Newell's disclosure controls and procedures were effective, stating, in relevant part:

**Item 4. Controls and Procedures**

As required by Rule 13a-15(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of its disclosure controls and procedures as of the end of the period covered by this Quarterly Report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) were effective as of the end of the period covered by this Quarterly Report.

As required by Rule 13a-15(d) under the Exchange Act, the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the Company's internal control over financial reporting to determine whether any changes occurred during the quarter covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Based on that evaluation, there have been no such changes during the quarter covered by this Quarterly Report.

155.    Attached to the Q2 2017 10-Q were SOX certifications signed by Defendants Polk and Nicoletti attesting to its accuracy.

***September 6, 2017 Hurricane Press Release***

156.    The Individual Defendants caused the Company to issue a press release on September 6, 2017, announcing that as a result of Hurricane Harvey, Newell had revised its 2017 earnings to account for the hurricane's effects on Newell's U.S. manufactured resin business. However, the press release reaffirmed that the Company expected core sales growth of 2.5% to 4% for 2017.

### *Barclays Global Consumer Staples Conference*

157.    Defendant Polk spoke at the Barclays Global Consumer Staples Conference on September 7, 2017, during which he made materially false and misleading statements regarding the Company's growth and integration of Jarden.

158.    For example, the presentation slides for the Conference included a slide titled "One company with one corporate strategy." That slide asserted that Newell had "[m]argin and cash flow expansion underpinned by consistent, competitive growth" and a "[p]roven operating model delivering above-market value creation."

159.    The statements in ¶¶ 120-129 and 135-158 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the Company's retail customers were holding high levels of unsold inventory of Newell products; (2) as a result of these excess inventories, Newell was subject to an increased risk that sales growth would be lower in future reporting periods; (3) the resulting adverse effects on sales were specific to Newell, rather than the result of a macroeconomic trends, as represented by the Individual Defendants; (4) the Company's sales figures in the early part of the Relevant Period were due, in part, to significant discounts provided to Newell's customers that exacerbated high levels of unsold inventory; (5) operational and cultural differences between Newell and Jarden were causing

internal strife and limiting synergies from the Jarden acquisition; (6) risks associated with the Company's long supply chain prevented Newell from responding quickly to market signals; (7) Newell's business fundamentals were not improving, contrary to representations made during the Relevant Period by certain of the Individual Defendants; (8) the Company failed to maintain internal controls; and (9) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge While False and Misleading Statements Continue**

*November 2, 2017 Press Release and Conference Call*

160.    On November 2, 2017, before markets opened, the Individual Defendants caused the Company to issue a press release announcing its financial results for the quarter ended September 30, 2017. The Company reported net sales of $3.7 billion for the quarter, representing net sales decline of 7% versus the prior year, and core sales growth of 0.4%. The press release further revised Newell's 2017 net sales outlook downward to between $14.7 and $14.8 billion and core sales growth downward to 1.5% to 2.0%.

161.    The press release quoted Defendant Polk as attributing the disappointing results to "weak late-quarter sales," stating, in relevant part:

> ***Newell Brands third quarter results were below expectations as our transformation progress was overshadowed by weak late-quarter sales related to retailer inventory rebalancing, primarily in response to decelerating U.S. market growth through the Back-to-School period*** . . . While markets across a number of categories were weaker than expected, we delivered solid point-of-sale growth of +3.5 percent and share improvement of +65 basis points in the U.S., driven by good results in the mass channel and strong double-digit growth in e-commerce. We continued to realize cost synergies as planned, with an incremental $86 million in the quarter. While those benefits, coupled with a lower than normal tax rate, were partially offset by weaker than expected sales, cost inflation and the absence of about $50 million of pre-tax earnings associated with divestitures, we still delivered double-digit earnings per share growth for the quarter.
>
> ***Despite challenging marketplace conditions, we are on a path to achieve our transformation objectives*** . . . Our market share increases, point of sale growth,

innovation and e-commerce development, and cost savings delivery have enabled competitive year-to-date results, strengthening our confidence in the transformative value creation opportunity inherent in Newell Brands. That confidence is shared by our Board, which has approved a $1 billion share repurchase authorization through 2020. This program will enable increased flexibility to allocate capital to our most attractive strategic options as part of our ongoing commitment to create value for our shareholders.

(Emphasis added.)

162.    Later, and also on November 2, 2017, the Company held a conference call with analysts and investors to discuss the Company's financial results for the quarter ended September 30, 2017. Regarding retailers' overstocking of Newell products, Defendant Polk attributed the issue to macroeconomic trends rather than issues at Newell, stating that "[w]e had unrelenting retailer inventory destocking, creating a headwind for revenue as our retail partners adjust to slowing market growth and changes in shopping patterns." Acknowledging that Newell's reported revenues missed expectations by $100 million, Defendant Polk misleadingly attributed much of this shortfall to weak U.S. Back-to-School retail channel sell-through in its Writing segment and inventory destocking in its Writing and Appliance businesses. This statement was false and misleading because the adverse effects on sales flowing from excess inventory were specific to Newell, rather than the result of a macroeconomic trends.

163.    Defendant Polk characterized Newell as experiencing "solid growth" in the month ended October 31, 2017, but explained that the Company had reduced its 2017 guidance to account for continued "headwinds" at certain customers in its Writing business, and an "assumed negative impact associated with the Toys "R" Us restructuring."

164.    Defendant Polk further revealed to conference call participants that one of the risks facing Newell was its expansive global supply chain, and the Company's resulting inability to respond nimbly to changes in demand. Defendant Polk stated, in relevant part:

For sure, *the reality of our business model is it's impossible to adjust in 30-day windows or 60-day windows or 45-day windows because of the fact that we're only 50% self-manufactured, and we have a long value chain of source finished goods that are on the water that's tied to kind of a forward-looking forecast*. It's really important for us to accept the retail landscape dynamics for what they are, such that we're not setting ambitions in the company that drive behaviors that carry too much risk. So, for example, *if we put too big a number out there and chase for top line, the divisions will build inventories to support that outcome* because they -- we won't do that without them having given us some confidence in that. And *if you miss, then you're hung out with those inventories*. And so, we have to make sure that we're doing a better job going forward with calibrating the upside in the business against the risk profile associated with the working capital position.

(Emphasis added.)

165.    In response to a question about the inventory levels of Newell's biggest customers, Defendant Polk stated that the Company can monitor inventory in the retail channel, including "perfect visibility into [its] largest retailer's inventory position." Defendant Polk stated, in relevant part:

*We have perfect visibility into our largest retailer's inventory position*. We know what our -- through retail link, you have that visibility. *You see exactly how many weeks on hand you've got at retail and how many weeks on hand you have in the warehouse*. So, we know exactly what has gone on there, and *we can see that by SKU* quite frankly, *every day*. So, we have perfect visibility at that customer and they share that with us because it's in their interest for us to know and to work with them to manage those inventories down. It's not true with every retailer. *We model our inventory position at by retail or by product family every month*. We're looking at this, so *there's a standard report that we're looking at, which is how I can tell you what I told you earlier on the retail landscape*.

(Emphasis added.)

166.    In addition to the visibility discussed above, Defendant Polk admitted during the call that the Company can gauge channel inventory by comparing its invoices to its point-of-sale data. Defendant Polk stated, in relevant part:

[W]e tracked 4 things every week that the data becomes available, some of it becomes available daily, some of it becomes available in 4-week increments. And we don't track Nielsen data in the traditional sense. We're looking at panel diary data, Nielsen panel diary data, which includes the e-commerce effect across all of our businesses. And in some cases that, that's not available, so we take what is

available which is an IRI platform. And then there are some specific databases in Team Sports that are neither IRI or panel diary. And then we aggregate that into a scorecard that all of us get that looks at the market growth data sellout in 4-week, 12-week, 52-week increments or market share, share change. And then we get POS data weekly, which is transaction data from our retailers, including Amazon, and we get the ability to split both [e-] from bricks-and-mortar. By product family we could go lower, but we've got all that data that comes in and gets aggregated. So, *you're not going to see the POS data that we see, we see that every week and it's the equivalent of retail link from all of our retailers. And then of course we have our invoicing that we compare all that to. We look at it across 75 product families, and we do this in the U.S. And so, we have a very, very granular view of our business, and it's a unique combination of these different data sources that gives us the perspective* . . .

167.     On this news, the Company's share price dropped nearly 27%, or $10.99, from a closing price of $41.00 per share on November 1, 2017 to close at $30.01 per share on November 2, 2017.

### *Q3 2017 10-Q*

168.     On November 8, 2017, the Company filed with the SEC its report for the fiscal quarter ended September 30, 2017 on Form 10-Q (the "Q3 2017 10-Q"), which was signed by Defendants Nicoletti and Cunningham.

169.     The Q3 2017 10-Q contained and MD&A section, which was false and misleading because the Individual Defendants caused the Company to fail to disclose, at least, that: (1) the Company's sales figures in the early part of the Relevant Period were due, in part, to significant discounts provided to Newell's customers that exacerbated high levels of unsold inventory; and (2) operational and cultural differences between Newell and Jarden were causing internal strife and limiting synergies from the Jarden acquisition.

170.     Regarding "Quantitative and Qualitative Disclosures about Market Risk," the Q3 2017 10-Q stated that: "[t]here have been no material changes from the information previously reported under Part II, Item 7A. in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2016."

171.    The Q3 2017 10-Q asserted that Newell's disclosure controls and procedures were effective, stating, in relevant part:

### Item 4. Controls and Procedures

As required by Rule 13a-15(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of its disclosure controls and procedures as of the end of the period covered by this Quarterly Report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) were effective as of the end of the period covered by this Quarterly Report.

As required by Rule 13a-15(d) under the Exchange Act, the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the Company's internal control over financial reporting to determine whether any changes occurred during the quarter covered by this Quarterly Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Based on that evaluation, there have been no such changes during the quarter covered by this Quarterly Report.

172.    Attached to the Q3 2017 10-Q were SOX certifications signed by Defendants Polk and Nicoletti attesting to its accuracy.

173.    The statements in ¶¶ 168-172 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the Company's retail customers were holding high levels of unsold inventory of Newell products; (2) as a result of these excess inventories, Newell was subject to an increased risk that sales growth would be lower in future reporting periods; (3) the resulting adverse effects on sales were specific to Newell, rather than the result of a macroeconomic trends, as represented by the Individual Defendants; (4) the Company's sales figures in the early part of the Relevant Period were due, in part, to significant discounts provided to Newell's customers that exacerbated high levels of unsold inventory; (5) operational and cultural differences between Newell and Jarden were causing internal strife and

limiting synergies from the Jarden acquisition; (6) risks associated with the Company's long supply chain prevented Newell from responding quickly to market signals; (7) Newell's business fundamentals were not improving, contrary to representations made during the Relevant Period by certain of the Individual Defendants; (8) the Company failed to maintain internal controls; and (9) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *January 25, 2018 Press Release*

174.    On January 25, 2018, before markets opened, the Individual Defendants caused the Company to issue a press release providing its preliminary estimated financial results for the year and quarter ended December 31, 2017. For the year, the Company reported estimated core sales growth of 0.8%, approximately half of the lower end of the Company's previously adjusted guidance of 1.5% to 2.0%. Based on the Company's quarterly releases during 2017, the January 25, 2018 press release implied that the Company had negative 2.0% organic sales growth in the quarter ended December 31, 2017.

175.    The January 25, 2018 press release attributed these lackluster results to excess retailer inventory and the bankruptcy of Toys "R" Us, stating, in relevant part: "[t]he company's core sales results were impacted by an acceleration of the gap between sell-in and sell-through results due to a continuation of retailer inventory rebalancing in the U.S. and the bankruptcy of a leading baby retailer." This statement was false and misleading because the adverse effects on sales flowing from excess inventory were specific to Newell, rather than the result of a macroeconomic trends.

176.    The January 25, 2018  press release announced that Newell would "explore a series of strategic initiatives to accelerate its transformation plan, improve operational performance and

enhance shareholder value." These strategic options included divesting industrial and commercial product assets, "result[ing] in a significant reduction in operational complexity through a 50 percent reduction in the company's global factory and warehouse footprint, a 50 percent reduction in its customer base and the consolidation of 80% of global sales on two ERP platforms by end of 2019."

177.    On this news, the Company's share price dropped nearly 21%, or $6.42, from a closing price of $31.23 per share on January 24, 2018 to close at $24.81 per share on January 25, 2017.

178.    In response to the revelations in the January 25, 2018 press release, securities analysts downgraded their rantings of Newell's common stock. These downgrades were based on: (1) concerns of integration synergies following the Merger; and (2) core growth below reported projections resulting from an increased gap between sell-through and sell-in of inventory to retail channels.

### *February 9, 2018 Article & Press Release*

179.    *The Wall Street Journal* published an article on February 9, 2018 titled "Starboard to Launch Proxy Fight to Replace Entire Newell Brands Board." The article asserted that Starboard, along with three former executives of Jarden (including Defendant Franklin, Jarden's former Chairman), had joined forces to force out the Board of Newell through a proxy battle. *The Wall Street Journal* reported that the former Jarden executives were ""unhappy about how the sprawling collection of consumer brands ha[d] been run since the 2016 deal."

180.    The Individual Defendants caused the Company to issue a press release on February 9, 2018, titled "Newell Brands Confirms Receipt of Starboard Value's Director Nominations." The press release confirmed that Newell had "received notice from Starboard Value and Opportunity

Master Fund Ltd. of its intention to nominate 10 candidates to stand for election to the Newell

Brands Board of Directors at the company's 2018 Annual Meeting of Shareholders."

181.    On February 12, 2018, Defendant Franklin spoke on CNBC, and asserted that

Newell's lackluster performance was attributable to failed execution, describing it as being "as

bad as I can imagine" rather than macro-economic conditions, as evidenced by the performance of

comparable firms. These assertions were contrary to those made during the Relevant Period by the

Individual Defendants. Defendant Franklin laid the blame with the Board, stating that it, was

"difficult to even have time to get meetings." Regarding the management of Newell and his plans

for the Company, Defendant Franklin stated, in relevant part: "the business model that's been

executed has failed, that model needs to be revised, and it needs new blood to revise it."

182.    Jeffries Group LLC issued a report on Newell, characterizing its financial reporting

as "at times opaque," and asserting that the Company's "communication to the Street has been

unreliable."

183.    The Individual Defendants caused the Company to issue a press release on April

23, 2018 announcing an agreement between Starboard and the Company to end the proxy contest.

As part of the agreement, Newell would appoint two new independent directors, effective

immediately, and nominate a third independent director for election at the Company's 2018

Annual Meeting of Shareholders.

184.    On May 1, 2018, Starboard released a detailed presentation demonstrating a number

of issues a Newell and making the following points, among others:

   • "While Newell Has Blamed Poor Performance on the Macro Environment, We
   Believe it Is Self-Inflicted and Can Be Improved . . . Many of Newell's issues are
   self-inflicted due to communication problems within the Company";

   • "While Newell's Revenue Is Declining, Its Peers Are Growing Consistently";

• "While Newell's Gross Margins Are Deteriorating, Its Peers' Are Continuing to Expand";

• "The Structure of the Organization Has Resulted in High Costs, Massive Inefficiencies, and Declining Revenue" including communication failures between divisions "resulting in inconsistent pricing. . . . These issues frustrate customers and lead to Newell giving large promotional concessions, which drastically lowers margins"; and

• "Communication issues between corporate and the divisions / brands have resulted in negative financial consequences for the Company."

## REPURCHASES DURING THE RELEVANT PERIOD

185.    During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $179.1 million to repurchase 5,565,391 shares of its own stock from February 2017 through January 2018.

186.    As the Company stock was actually only worth $24.81 per share, the price at closing on January 25, 2018, the Company overpaid more than $41 million in total for these repurchases.

187.    According to the Company's Q1 2017 10-Q, in the month of February 2017, the Individual Defendants caused the Company to repurchase 387,081 shares of its own common stock at an average price per share of approximately $47.06, for a total cost to the Company of approximately $18.2 million.[17]

188.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $22.25 more than the actual worth of each share during the month of February 2017. Thus,

---

[17] Upon information and belief, some, if not all of these repurchases occurred after the Relevant Period began on February 6, 2017.

the total over payment by the Company for repurchases of its own stock during February 2017 was approximately $8.6 million.

189.    According to the Company's Q1 2017 10-Q, in the month of March 2017, the Individual Defendants caused the Company to repurchase 2,301 shares of its own common stock at an average price per share of approximately $49.60, for a total cost to the Company of approximately $114,130.

190.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $24.79 more than the actual worth of each share during the month of March 2017. Thus, the total over payment by the Company for repurchases of its own stock during March 2017 was approximately $57,041.

191.    According to the Company's Q2 2017 10-Q, in the quarter ended June 30, 2017, the Individual Defendants caused the Company to repurchase 142,133 shares of its own common stock at an average price per share of approximately $53.33, for a total cost to the Company of approximately $7.6 million.

192.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $28.52 more than the actual worth of each share during the quarter ended June 30, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended June 30, 2017 was approximately $4.1 million.

193.    According to the Company's Q3 2017 10-Q, in the quarter ended September 30, 2017, the Individual Defendants caused the Company to repurchase 8,230 shares of its own

common stock at an average price per share of approximately $50.50, for a total cost to the Company of approximately $415,615.

194.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $25.69 more than the actual worth of each share during the quarter ended September 30, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended September 30, 2017 was approximately $211,428.

195.     According to the Company's 2017 10-K, in the quarter ended December 31, 2017, the Individual Defendants caused the Company to repurchase 5,024,892 shares of its own common stock at an average price per share of approximately $30.40, for a total cost to the Company of approximately $152.8 million.

196.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $5.59 more than the actual worth of each share during the quarter ended December 31, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended December 31, 2017 was approximately $28.1 million.

197.     According to the Company's Form 10-Q filed with the SEC on May 10, 2018, in the month of January 2018, the Individual Defendants caused the Company to repurchase 754 shares of its own common stock at an average price per share of approximately $25.73, for a total cost to the Company of approximately $19,400.[18]

---

[18] Upon information and belief, some, if not all of these repurchases occurred before the truth emerged on January 24, 2018.

198.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $0.92 more than the actual worth of each share during the month of January 2018. Thus, the total over payment by the Company for repurchases of its own stock during the month of January 2018 was approximately $693.

199.     In total, the Company overpaid an aggregate amount of approximately $41 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

## DAMAGES TO NEWELL

200.     As a direct and proximate result of the Individual Defendants' conduct, Newell has lost and expended, and will lose and expend, many millions of dollars.

201.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, CFO, and CAO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

202.     Such losses include, but are not limited to, approximately $41 million that the Company overpaid, at the direction of the Individual Defendants, for its repurchases of its own stock at artificially inflated prices.

203.     Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

204.     As a direct and proximate result of the Individual Defendants' conduct, Newell has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount"

that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

205.    Plaintiff brings this action derivatively and for the benefit of Newell to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Newell, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

206.    Newell is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

207.    Plaintiff is, and has been at all relevant times, a shareholder of Newell. Plaintiff will adequately and fairly represent the interests of Newell in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

208.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

209.    A pre-suit demand on the Board of Newell is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following twelve individuals: Individual Defendants Polk, Strobel, and Todman (the "Director-Defendants") and non-parties Bridget Ryan Berman, Patrick D. Campbell, James R. Craigie, Debra A. Crew, Brett M. Icahn, Gerardo I. Lopez, Courtney R. Mather, Judith A. Sprieser and Robert A. Steele (collectively, with the Director-

Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve directors who were on the Board at the time this action was commenced.

210.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of them engaged in insider sales based on material non-public information, netting proceeds of approximately $264,331, while, at the same time, they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

211.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the conduct alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

212.   Additional reasons that demand on Director-Defendant Polk is futile follow. Director-Defendant Polk has served as the Company's CEO and a Company director since 2011, and as the Company's President since May 25, 2018. Thus, as the Company admits, Director-Defendant Polk is a non-independent director. Indeed, he receives handsome compensation, including nearly $15.3 million in the fiscal year ended December 31, 2017 and $21,684,542 in the fiscal year ended December 31, 2016. As the Company's CEO, Director-Defendant Polk's compensation would be inflated by the false and misleading statements described herein,

demonstrating his motive in facilitating and participating in the fraud. Moreover, Director-Defendant Polk is a Defendant in the Securities Class Action. As a trusted Company director and CEO during the Relevant Period, Director-Defendant Polk conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Director-Defendant Polk was ultimately responsible for all of the misconduct alleged herein, including the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings, and the Company's press releases in earnings calls, in which he personally made statements. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Director-Defendant Polk breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.   Additional reasons that demand on Director-Defendant Strobel is futile follow. Director-Defendant Strobel has served as a Company director since 2006, and is the Chair of the Audit Committee. He receives handsome compensation, including $280,530 in the fiscal year ended December 31, 2017. His insider sale before the fraud was exposed, which yielded approximately $264,331 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a long-time Company director and Chair of the Audit Committee, Director-Defendant Strobel conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of

material fact that are alleged herein, as he signed the 2017 10-K. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Director-Defendant Strobel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214.   Additional reasons that demand on Director-Defendant Todman is futile follow. Director-Defendant Todman has served as a Company director since 2007, and is a member of the Audit Committee. He receives handsome compensation, including $275,530 in the fiscal year ended December 31, 2017. As a long-time Company director and member of the Audit Committee Director-Defendant Todman conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 10-K. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Director-Defendant Todman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215.   Additional reasons that demand on the Board is futile follow.

216.   As described above, one of the Directors on the Board directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Director-Defendant Strobel received proceeds of approximately $264,331 as a result of an insider transaction executed during the period when the Company's stock price was artificially inflated due to the false and

misleading statements alleged herein. Therefore, demand in this case is futile as to Director-Defendant Strobel, and excused.

217.    Demand in this case is excused because the Director-Defendants, all of whom are named as defendants in this action, and one of whom is a defendant in the Securities Class Action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

218.    Numerous Defendants and Directors have connections through past positions with Kraft Foods. Director-Defendant Polk served in various roles of increasing responsibility at Kraft Foods between 1987 and 2003. Director-Defendant Strobel served in various roles of increasing financial responsibility at Kraft Foods between 1986 and 1996. Defendant Viault was with Kraft Foods for a total of 20 years, culminating with a stint as President and CEO from 1900 to 1996. Between 1983 and 1998, non-party James R. Craigie ("Craigie") also served at Kraft Foods in various senior management positions. Non-party Debra A. Crew ("Crew") worked in a number of management positions at Kraft Foods between 1997 and 2004. Thus, Director-Defendants Polk and Strobel served together at Kraft Foods for nearly a decade, and non-parties Crew and Craigie had tenures at Kraft Foods that overlapped with Director-Defendant Polk's for approximately six and eleven years, respectively. Defendant Viault's tenure as CEO and President overlapped with all of these individuals' tenures Kraft Foods, with the exceptions of non-party Crew. These social and professional connections, combined with the substantial likelihood of liability that Defendant

Polk faces in the Securities Class Action, and the substantial likelihood of liability that Defendants Polk, Strobel and Viault face in the instant action, prevents Director-Defendant Polk from evaluating a demand with disinterestedness or independence, and prevents Director-Defendant Strobel, as well as non-parties Crew and Craigie from evaluating a demand with independence. Thus, demand upon Director-Defendants Polk and Strobel, and upon non-parties Crew and Craigie, is futile, and therefore, excused.

219.    Further, numerous Defendants and Directors have connections through past positions with The Procter & Gamble Company ("Procter & Gamble"). Director-Defendant Polk worked at Procter & Gamble between 1982 and 1985. Non-party Gerardo I. Lopez ("Lopez") worked at Procter & Gamble from 1984 to 1986. Non-party Robert A. Steele ("Steele") spent thirty-five years at Procter & Gamble, holding several leadership positions and ultimately retiring in 2011. Defendant Cowhig served as Procter & Gamble's President, Global Technical and Manufacturing from 2005 to 2006. Defendant De Sole was a director of Procter & Gamble from 2001 to 2005. Thus, Director-Defendant Polk served at Procter & Gamble contemporaneously with non-party Steele during the entirety of Director-Defendant Polk's three year tenure at Procter & Gamble, and contemporaneously with non-party Lopez for approximately two years. Further, Defendants Cowhig and De Sole served as a senior executive and director of Procter & Gamble, respectively, during non-party Steele's time at the company. These social and professional connections, combined with the substantial likelihood of liability that Defendant Polk faces in the Securities Class Action, and the substantial likelihood of liability that Defendants Polk, Cowhig, and De Sole face in the instant action, prevents Director-Defendant Polk from evaluating a demand with disinterestedness or independence, and prevents non-parties Lopez and Steele from

evaluating a demand with independence. Thus, demand upon Director-Defendant Polk, and upon non-parties Lopez and Steele, is futile, and therefore, excused.

220.   Additionally, each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $41 million for its own common stock during the period in which the false and misleading statements were made. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company, and yet they approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

221.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the scheme to make, and to fail to correct, materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

222.   In violation of the Code of Ethics, Defendant Polk conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust

enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Code of Ethics, Defendant Polk failed to maintain the accuracy of Company records and reports, comply with laws and regulations, act with honesty and integrity, and properly report violations of the Code of Ethics.

223.   Newell has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Director-Defendants or others who were responsible for that wrongful conduct to attempt to recover for Newell any part of the damages Newell suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

224.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

225.   The acts complained of herein constitute violations of fiduciary duties owed by Newell's officers and directors, and these acts are incapable of ratification.

226.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Newell. If there is a directors' and officers' liability

insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of Newell, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

227.   If there is no directors' and officers' liability insurance, then the Directors will not cause Newell to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

228.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

229.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of,

or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

231.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

232.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

233.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) the Company's retail customers were holding high levels of unsold inventory of Newell products; (2) as a result of these excess inventories, Newell was subject to an increased risk that sales growth would be lower in future reporting periods; (3) the resulting adverse effects on sales were specific to Newell, rather than the result of a macroeconomic trends, as represented by the Individual Defendants; (4) the Company's sales figures in the early part of the Relevant Period were due, in part, to significant discounts provided to Newell's customers that exacerbated high levels of unsold inventory; (5) operational and cultural differences between Newell and Jarden were causing internal strife and limiting synergies from the Jarden acquisition; (6) risks

associated with the Company's long supply chain prevented Newell from responding quickly to market signals; (7) Newell's business fundamentals were not improving, contrary to representations made during the Relevant Period by certain of the Individual Defendants; (8) the Company failed to maintain internal controls; and (9) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

234.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's stock price was being artificially inflated by the Individual Defendants' scheme, and therefore any compensation based on the Company's stock price was artificially inflated.

235.    The 2017 Proxy Statement also made reference to the Company's Code of Conduct and Code of Ethics. The Code of Conduct required the Company and Individual Defendants to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, refrain from insider trading, and properly report violations of the Code of Conduct. The Code of Ethics required Defendants Polk, Nicoletti and Cunningham to maintain the accuracy of Company records and reports, comply with laws and regulations, act with honesty and integrity, and properly report violations of the Code of Ethics. By issuing false and misleading statements to the investing public, engaging in insider trading, and permitting retaliation against employees, the Individual Defendants violated the Code of Conduct. By failing to maintain the accuracy of Company records and reports, comply with laws and regulations, act with honesty and integrity, and properly report violations of the Code of Ethics, Defendants Polk, Nicoletti, and Cunningham violated the Code of Ethics. The 2017 Proxy

Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Conduct and Code of Ethics were being violated.

236.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

237.    The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Ashken, Clarke, Conroy, Cowen, Cowhig, De Sole, Franklin, L'Esperance, Polk, Strobel, Todman, and Viault, which allowed them to continue breaching their fiduciary duties to Newell.

238.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

239.    Plaintiff, on behalf of Newell, has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

240.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

241.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Newell. Not only is Newell now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, the Company itself is also a victim of the unlawful scheme perpetrated upon Newell by the Individual Defendants. With the

price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of dollars of its own shares at artificially-inflated prices, damaging Newell.

242.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

243.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Newell not misleading.

244.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Newell. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and

misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

245.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, the Individual Defendants made and/or signed the Company's Form 10-Ks and 10-Qs filed with the SEC during the Relevant Period.

246.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

247.    Plaintiff, on behalf of Newell, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

248.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

249.    The Individual Defendants, by virtue of their positions with Newell and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Newell and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20 (a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Newell to engage in the illegal conduct and practices complained of herein.

250.    Plaintiff, on behalf of Newell, has no adequate remedy at law.

## FOURTH CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

251.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

252.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Newell's business and affairs.

253.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

254.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Newell.

255.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

256.    Also in breach of their fiduciary duties owed to Newell, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company's retail customers were holding high levels of unsold inventory of Newell products; (2) as a result of these excess inventories, Newell was subject to an increased risk that sales growth would be lower in future reporting periods; (3) the resulting adverse effects on sales were specific to Newell, rather than the result of a macroeconomic trends, as represented by the Individual Defendants; (4) the Company's sales figures in the early part of the Relevant Period were due, in part, to significant discounts provided to Newell's customers that exacerbated high levels of unsold inventory; (5) operational and cultural differences between Newell and Jarden were causing internal strife and limiting synergies from the Jarden acquisition; (6) risks associated with the Company's long supply chain

prevented Newell from responding quickly to market signals; (7) Newell's business fundamentals were not improving, contrary to representations made during the Relevant Period by certain of the Individual Defendants; (8) the Company failed to maintain internal controls; and (9) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

257.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

258.    In breach of their fiduciary duties, six of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing over $179.1 million worth of Company stock at artificially inflated prices.

259.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Newell's securities and disguising insider sales.

260.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and, *inter alia*, for the purpose and effect of artificially inflating the price of Newell's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

261.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

262.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Newell has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

263.    Plaintiff, on behalf of Newell, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

264.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

265.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Newell.

266.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Newell that was tied to the performance or artificially inflated valuation of Newell, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

267.    Plaintiff, as a shareholder and a representative of Newell, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

268.    Plaintiff, on behalf of Newell, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

269.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

270.    As a result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

271.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

272.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

273.    Plaintiff, on behalf of Newell, has no adequate remedy at law.

**PRAYER FOR RELIEF**

274.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Newell, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Newell;

(c)    Determining and awarding to Newell the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Newell and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Newell and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Newell to nominate at least six candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Newell restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and

proper.

Dated: October 29, 2018                    Respectfully submitted,

Of Counsel:                                **FARNAN LLP**

                                           /s/ Michael J. Farnan
**THE ROSEN LAW FIRM, P.A.**               Brian E. Farnan (Bar No. 4089)
Phillip Kim                                Michael J. Farnan (Bar No. 5165)
275 Madison Avenue                         919 N. Market St., 12th Floor
New York, NY 10016                         Wilmington, DE 19801
Tel: (212) 686-1060                        Telephone: (302) 777-0300
Fax: (212) 202-3827                        Facsimile: (302) 777-0301
Email: pkim@rosenlegal.com                 Email: bfarnan@farnanlaw.com
                                           Email: mfarnan@farnanlaw.com

                                           *Attorneys for Plaintiff*